# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

P. Jonathan Meyer, *et al.*,

      Plaintiffs/Counter-Defendants,    :     Case No. 2:18-cv-218

      v.
                                :

Bank of America, N.A.,

      Defendant/Counter-Plaintiff/    :
      Third-Party Plaintiff,

      v.                                :     Judge Sarah D. Morrison
                                              Magistrate Judge Kimberly A. Jolson

Stanbery English Village, LP, *et al.*,

                                :

      Third-Party Defendants.

## OPINION AND ORDER

This matter is before the Court on Plaintiffs'/Counter-Defendants'/Third-Party Defendants' (ECF No. 60) and Defendant's/Counter-Plaintiff's/Third-Party Plaintiff's (ECF No. 59) Motions for Summary Judgment. The parties have filed Memoranda in Opposition (ECF Nos. 61, 62), and Replies (ECF Nos. 66, 67). These matters are now ripe for decision.

## I.      STATEMENT OF THE FACTS

In January 2000, Plaintiffs/Counter-Defendants Paul Jonathan Meyer and Mark Pottschmidt co-founded Stanbery Development, LTD[1], ("Stanbery Development") for the purpose of developing retail properties. (Paul Jonathan Meyer Dep. 10:11–11:19, 14:10–11, ECF No. 49.) In addition, Mr. Meyer, Mr. Pottschmidt, and Plaintiff/Counter-Defendant Raymond Brunt (each an "Assignor" and collectively the "Assignors") each own an interest in Third-Party

---

[1] The Complaint erroneously refers to "Stanbery Development, LLC," (Compl., ECF No. 11, ¶ 8), but this was intended to refer to the same company, (Paul Jonathan Meyer Dep. 12:24–14:11, ECF No. 49).

Defendants Stanbery English Village, LP; The Shoppes at Union Hill, LLC; and Stanbery Harrisburg, LP, as well as in non-party Stanbery Old Bridge, LLC (each a "Company" and collectively the "Companies"). (Def. Mot. Summ. J., at 3, ECF No. 59.)

Prior to the 2008 economic downturn, Stanbery Development took out loans (the "Loans") from LaSalle Bank for the development of five properties (the "Leveraged Properties"). (Meyer Dep. 15:22–17:21.) Around this same time, Defendant/Counter-Plaintiff/Third-Party Plaintiff Bank of America, N.A., (the "Bank") acquired LaSalle Bank and took over the Loans. (Michael Olson Dep. 5:21–6:16, 7:12–16; Meyer Dep. 28:11–14.)

The rippling effects of the economic downturn caused the Leveraged Properties to decline in value, and the amounts owed on the Loans ultimately exceeded the values of the Leveraged Properties. (Meyer Decl. ¶ 4, ECF No. 60-4; Meyer Dep. 17:12–18:6.) The conversations surrounding resolution of the Assignors' responsibility for the Loans focused on four properties that were owned by the Companies (and in which the Assignors each had an interest as co-owners of the Companies): Shoppes at Old Bridge ("Old Bridge"), Shoppes at Susquehanna Marketplace ("Harrisburg"), Shoppes at Union Hill ("Union Hill"), and Shoppes at English Village ("English Village") (each a "Property" and collectively the "Properties"). (Meyer Dep. 12:7–21, 58:2–20; Raymond Brunt Dep. 6:11–7:7, ECF No. 50.) The Bank did not have an interest in the Properties prior to these settlement conversations. (Olson Dep. 37:22–38:4.)

Ultimately, the Bank negotiated a deal with the Assignors, which was memorialized in sixty Assignment of Proceeds documents (the "Assignments"). (Meyer Dep. 49:15–50:10; ECF No. 60-4, at 119–55; ECF Nos. 60-5 – 60-7; ECF No. 60-38, at 8–134; ECF Nos. 60-39 – 60-40; ECF No. 60-41, at 7–144; ECF Nos. 60-42 – 60-43.) On September 30, 2010, the Bank signed

all sixty Assignments, while each of the three Assignors signed five Assignments[2] for each of the Properties. (ECF No. 60-4, at 119–55; ECF Nos. 60-5 – 60-7; ECF No. 60-38, at 8–134; ECF Nos. 60-39 – 60-40; ECF No. 60-41, at 7–144; ECF Nos. 60-42 – 60-43.) Through these Assignments, the parties agreed to split the proceeds of any transactions involving the Properties. (ECF No. 60-4, at 119–55; ECF Nos. 60-5 – 60-7; ECF No. 60-38, at 8–134; ECF Nos. 60-39 – 60-40; ECF No. 60-41, at 7–144; ECF Nos. 60-42 – 60-43.) All sixty Assignments are the same except for the designated Assignor, the Company (and therefore the Property) to which they apply, the percentage of the proceeds due to the Bank, and the particular Leveraged Property involved. (Meyer Dep. 49:15–50:5; ECF No. 60-4, at 119–55; ECF Nos. 60-5 – 60-7; ECF No. 60-38, at 8–134; ECF Nos. 60-39 – 60-40; ECF No. 60-41, at 7–144; ECF Nos. 60-42 – 60-43.)

On May 8, 2013, Union Hill was refinanced. (ECF No. 60-44, at 4, 8.) The Assignors subsequently put the proceeds from the refinancing ($85,670) into escrow. (ECF Nos. 60-46, 60-47.) On or before December 13, 2013, English Village was refinanced. (ECF No. 60-48.) The Assignors subsequently escrowed $46,429 as a result of this transaction. (ECF No. 60-52, at 3–4.)

On April 28, 2015, Gerry Swedlow, outside counsel for Stanbery Development, notified the Bank that the Assignors intended to dispose of their interests in Old Bridge via a deed in lieu of foreclosure. (ECF No. 60-53, at 1; Meyer Dep. 43:3–5.) On May 15, 2015, Old Bridge executed the deed in lieu of foreclosure. (ECF No. 59-12, at 4.) That same day, Mr. Swedlow notified the Bank that the Old Bridge transaction had resulted in a net tax loss of over $5 million. (ECF No. 60-4, at 59–61.) It appears that the Assignors now contend that Old Bridge generated a tax liability of closer to $2 million. (Pls. Mot. Summ. J., at 6–7, ECF No. 60.) It is not clear what

---

[2] Each Assignor signed five Assignments for each Property, because each Assignment encompasses one of the five Leveraged Properties. (Meyer Dep. 15:1–16:4; ECF No. 60-38, at 8, 25, 41, 63, 85.)

the Bank's calculations are on this point. Regardless, the parties do not dispute that the transfer of Old Bridge resulted in a loss.

On April 28, 2015, Mr. Swedlow notified the Bank that a sale on the Harrisburg property was expected in approximately one month. (ECF No. 60-53, at 1.) Around May 28, 2015, the Harrisburg sale closed. (ECF No. 60-56, at 3; ECF No. 59-14, at 23.) On June 10, 2015, Mr. Swedlow provided the Bank with the calculations for the Harrisburg sale. (ECF No. 60-56.) The Assignors allege that the Bank did not object to this calculation. (ECF No. 60, at 19.) There is no evidence to the contrary. The Assignors' and the Bank's calculations as to this sale are dramatically different, both in terms of the mode of calculation and the figures being calculated. (*Compare* ECF No. 60-56, at 3, *with* ECF No. 59-14, at 23.) The Assignors did not escrow any money from the Harrisburg transaction. (*See* Mark Pottschmidt Dep., 27:1–6, ECF No. 51; Pottschmidt Dep. Ex. 13, ECF No. 51-1.)

On March 9, 2016, Mr. Meyer notified the Bank via email of the impending sale of Union Hill, attaching a preliminary tax calculation. (ECF No. 60-58.) On March 30, 2016, the Union Hill property sold, and on June 15, 2016, Mr. Meyer provided updated calculations to the Bank. (ECF No. 60-59.) The Bank confirmed receiving the calculations but offered no substantive response. (ECF No. 60-60.) As with the Harrisburg sale, there is a substantial difference between the parties' Union Hill sale calculations. (*Compare* ECF No. 60-59, at 7, *with* ECF No. 59-14, at 27.) The Assignors did not escrow any money from the Union Hill transaction. (Pottschmidt Dep., 27:1–6; ECF No. 51-1; ECF No. 60, at 20.)

On September 12, 2016, the Bank contacted Mr. Meyer and, for the first time, raised some general concerns about the Assignors' calculations and the money that was being escrowed. (ECF No. 59-20.) Over approximately the next month, the Bank continued to raise

objections about the calculations and the money that was being escrowed but never indicated that the Assignors may have breached the Assignments in any other manner. (ECF Nos. 59-20, 59-21.)

On August 4, 2017, Mr. Meyer notified the Bank that the English Village property was going to be sold and provided estimated calculations. (ECF No. 60-4, at 66–74.) The closing occurred that same day. (ECF No. 59-17.) Again, Assignors' estimated calculations are very different from the Bank's. (*Compare* ECF No. 60-4, at 67–69, *with* ECF No. 59-14, at 18.) As with Harrisburg and Union Hill, the Assignors did not escrow any funds related to the English Village sale. (ECF No. 59-16, at 2; *see* ECF No. 51-1.) On August 30, 2017, the Bank's counsel sent the Assignors' counsel a letter objecting to the Assignors' English Village calculations and the Assignors' failure to put any additional money into escrow. (ECF No. 60-68.)

## II. PROCEDURAL HISTORY

On November 13, 2017, the Assignors filed a Complaint in the Franklin County Court of Common Pleas. (Compl., ECF No. 11.) Count One of the Complaint requests that the Court issue a declaratory judgment as to the following: 1) that the Assignors have correctly calculated the Sale Proceeds (as defined in the Assignments) for English Village; 2) that the Assignors are not required to put any additional funds into escrow; and 3) that all amounts in escrow be returned to the Assignors. (*Id.* at 9.) The Complaint also requests declaratory judgments that the Bank has waived its right to challenge the Assignors' Sale Proceeds calculations as to Old Bridge, Harrisburg, and Union Hill, either intentionally (Count Two) or by estoppel (Count Four); that the Bank has ratified the Old Bridge, Harrisburg, and Union Hill calculations (Count Three); and that laches bars the Bank from challenging these calculations (Count Five).

On March 14, 2018, the Bank timely removed the Complaint to this Court. (ECF No. 1.) On March 16, 2018, the Bank filed three Counterclaims (Counts One through Three) against the Assignors for breach of contract regarding the sales of English Village, Harrisburg, and Union Hill. (Counterclaim and Third-Party Compl., at 10–28, ECF No. 4.) The Bank also filed three Counterclaims (Counts Six through Eight) against the Assignors for breaches of the Ohio Uniform Fraudulent Transfer Act (the "UFTA") regarding the sales of English Village, Harrisburg, and Union Hill. (*Id.* at 32–41.) The Bank has also asserted these breach of contract and UFTA claims as third-party claims against Third-Party Defendants Stanbery English Village, LP (Counts One and Six); Stanbery Harrisburg, LP (Counts Two and Seven); and The Shoppes at Union Hill, LLC (Counts Three and Eight). (*Id.* at 10–28, 32–41.)[3]

III.    **STANDARD OF REVIEW**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). The burden then shifts to the nonmoving party to "'set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970).

---

[3] Counts Four and Five in the Bank's Counterclaim and Third-Party Complaint were brought against Third-Party Defendants that have since been dismissed from this matter. (ECF No. 4, at 28–32; ECF No. 31.)

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "summary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## IV.   ANALYSIS

The Court begins with the interpretation of the Assignments. "Under Ohio law, the interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008). "[A] contract is 'unambiguous' if a reviewing court 'can give a definite legal meaning' to the contract's terms." *United States v. Ohio*, 787 F.3d 350, 353 (6th Cir. 2015) (quoting *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003)). Where a contract's terms are not ambiguous, the interpreting court must apply the plain language of the contract. *Savedoff*, 524 F.3d at 763. The court must presume that interpreting the plain language will give rise to the parties' intent. *Id.* Only where a contract is ambiguous may the court look to extrinsic evidence to ascertain the parties' intent. *Id.*; *Ohio*, 787 F.3d at 354.

Here, the Assignments are not ambiguous. While the relevant provisions are difficult to discern, they can only be interpreted to possess one legal meaning. The Court is thus bound by the plain language of the contracts and is not permitted to look at the extrinsic evidence introduced by the parties for purposes of interpreting the contractual language at issue.

A.      **Calculation of the Sale Proceeds**

The calculation of the "Sale Proceeds" under the Assignments is the basis of the

Assignors' first declaratory judgment request. Pursuant to § 1(a) of the Assignments, the

Assignors agreed to give a designated percentage (the "Percentage") of the "Sale Proceeds" to

the Bank. (ECF No. 60-38, at 64.) "Sale Proceeds," in turn, is defined in § 1(a)(i) by an

equation—it is the proceeds received from "a Sale" by "the Company and/or the Assignor," less

various expenses, including closing costs, taxes owed by "the Company or Assignor," and the

payoff of a portion of the Loan debt. (*Id.*) "Sale" is defined in § 1(a)(ii) as a transfer in control or

assets of a Company and includes any refinancing or restructuring of a Company. (*Id.*) This is

distinct from a "Qualifying Sale," which is defined in § 1(c)(iii)(B) as a Sale of at least the

majority interest in a Company or of essentially all of the assets of a Company. (*Id.* at 65–66.)

The parties do not dispute any of these provisions except how the Sale Proceeds are to be

calculated.[4] The Bank argues that pursuant to the definition of "Sale Proceeds," taxes are

deducted from proceeds on a per-transaction basis, based on § 1(a)(i)'s reference to "a Sale,"

"the Company," and "the Assignor," all in the singular form. (ECF No. 59, at 11-12.) The

Assignors dispute this reading, although their alternative interpretation is not entirely clear. (ECF

No. 60, at 27–28.) However the Assignors are interpreting this provision, the upshot of their

interpretation is that they seek to deduct the taxes that they owe *after* multiplication of the

Percentage. (*See* ECF No. 60-56, at 3; ECF No. 60-59, at 7; ECF No. 60-4, at 67–69; ECF No.

60, at 28 ("[E]ach of the Assignors actually paid . . . tax far in excess of the proceeds

---

[4] The Assignors emphasize that the Old Bridge deed-in-lieu meets the definition of a Sale and imply that
the Bank disagrees, (ECF No. 60, at 28–29), but the Bank does not, in fact, dispute this, (ECF No. 61, at 8).

received . . . .".).) That is, the Assignors seek to deduct their taxes not from the total sale price but from their *individual percentages* of the sale price.

The Bank's interpretation is correct. The Assignments contemplate that the taxes (and other expenses) are deducted not from the Sale Proceeds, but from whatever is received in the course of the Sale (i.e., the "proceeds" with a lowercase "p"). The "Sale Proceeds" (a defined term with a capital "P") are what results from the equation; the taxes owed are themselves a *component* of the Sale Proceeds calculation. And because § 1(a) requires that the Percentage be multiplied against the Sale Proceeds, the Percentage has nothing to be multiplied against until the Sale Proceeds are calculated (after the taxes have already been deducted).

If the calculations are made as argued by the Assignors, the taxes are deducted not from the proceeds received from the Sale but rather from an ad hoc calculation that does not conform to any part of § 1(a). The irrationality of this calculation is demonstrated by the fact that the Assignors seek to deduct the closing costs and the debt payoff from the proceeds at a different time (before the Percentage is applied) than the taxes (after the Percentage is applied). But the § 1(a)(1) definition of "Sale Proceeds" explicitly says that the costs and debt payoff will be deducted at the same time as the taxes, with each being deducted from the proceeds received before generating the final Sale Proceeds amount.

Accordingly, as to the first component of Count One, the Assignors' declaratory judgment claim, the Assignors have not calculated the Sale Proceeds calculation correctly as to English Village because they have not deducted the taxes from the proceeds received prior to multiplying the Percentage. Plaintiffs' Motion for Summary Judgment as to the first component of Count One is **DENIED**, and Defendant's Motion for Summary Judgment as to this component is **GRANTED**.

**B.      Distribution of Escrow Funds**

As to the second and third components of Count One, the Assignors request declarations that they are not required to put any additional funds into escrow and that all amounts in escrow be returned to them. A determination of this issue requires a deep dive into how escrow is funded under the Assignments and how the parties agreed to distribute the funds.

Pursuant to § 1(c)(ii), after a Sale occurred, "the Company" was to pay its Percentage of the Sale Proceeds to the designated escrow agent within three days of receipt of the Sale Proceeds. (ECF No. 60-38, at 65.) The amount due to the escrow agent under each Assignment is defined in § 1(d)(ii) as the "Escrow Amount." (*Id.* at 67.) The Escrow Amount is then a component of the "Escrow Funds," a term that is the subject of one of the parties' disputes. The Assignors argue that the Escrow Funds consist of the sum of the Escrow Amounts from all sixty Assignments. (ECF No. 60, at 29–30.) The Bank argues that the Escrow Funds are categorized by Company, such that there are four pots of Escrow Funds, each consisting of the sum of the Escrow Amounts resulting from the fifteen Assignments pertaining to each particular Company. (Def. Opp. to Pl. Mot. Summ. J., at 9, ECF No. 61.) The Bank's interpretation finds no support in the Assignments.

Section (d)(ii) defines "Escrow Funds" as being "[t]he Escrow Amount and all amounts payable to the Escrow Agent pursuant to each respective Section 1 of the Other Assignments . . . ." (ECF No. 60-38, at 67.) The Bank argues that this reference to "Other Assignments" only refers to the other fourteen Assignments "related to that particular Company." (ECF No. 61, at 9.) The Bank invents that qualifier, for that is not what the Assignments say. The Assignments explicitly define "Other Assignments" as "the documents listed on Schedule 1(d)," and the Schedules 1(d) all include the other fifty-nine Assignments—not just the other fourteen

Assignments related to the particular Company at issue. (*See, e.g.*, ECF No. 60-38, at 67, 76–83.) Thus, because "Escrow Funds" is defined as the Escrow Amounts from the Other Assignments— which means *all* of the other Assignments—it is the collective Escrow Amounts across all sixty Assignments that combined into the Escrow Funds.

The Assignments also specifically provide that at least a portion of the Escrow Funds were to "be available for the payment of certain tax obligations of the Company or Assignor as set forth in" § 1(d)(iii)(A). (ECF No. 60-38, at 67.) The Bank acknowledges as much. (ECF No. 59, at 14.)

However, there is further disagreement between the parties about two other aspects of the Assignments' escrow provisions. First, the parties disagree about when the Escrow Funds could be disbursed to the Bank. The Assignors argue that the Bank was not entitled to receive the Escrow Funds until all of the Properties had been appraised or had undergone a Qualifying Sale. (ECF No. 60, at 31.) The Bank, on the other hand, argues that it could have requested disbursement of the Escrow Funds at any point after a Qualifying Sale. (ECF No. 59, at 5.) Second, the parties disagree about the extent to which the Escrow Funds could be used towards the Assignors' taxes. The Assignors argue that taxes were to be deducted prior to the distribution of any Escrow Funds, (Pls. Opp. to Def. Mot. Summ. J., at 3, ECF No. 62), while the Bank argues that taxes were to be offset after each transaction, (ECF No. 59, at 14–15). Neither party's interpretations are entirely correct.

The provisions regarding the tax offset and distribution of funds are heavily integrated, and each helps to divine the meaning of the other. As a result, the Court first provides its interpretation of both provisions and then addresses where the parties' alternative arguments go wrong.

Section 1(d)(iii)(A) defines the "Tax Balance" as the taxes owed "by the Company or Assignor" as a result of a Sale, less any money due to the Company or Assignor from the Sale. (ECF No. 60-38, at 67.) That Section then goes on to say that if "at the time of any Sale," the Escrow Funds have a positive balance and the Tax Balance is positive, the Bank and the Assignor would be obligated to jointly instruct the escrow agent to release enough of the Escrow Funds to the Assignor to pay the Tax Balance. (*Id.*) However, § 1(d)(iii)(A) limits the Assignor to the amount of Escrow Funds that existed at the time of the Sale. (*Id.*) Accordingly, every time a Sale were to occur, all of the money in the escrow account (if any) had to be used to pay the taxes owed by the applicable Company or Assignor until the Assignor's taxes were paid off or the amount in escrow was exhausted. Only any amount in excess of the taxes would remain in escrow. Thus, when a Sale occurred, if the Tax Balance exceeded the Escrow Funds, the amount in escrow would be zeroed out because the Escrow Funds would be applied in their entirety towards the Tax Balance. On the other hand, if the Escrow Funds exceeded the Tax Balance, any excess amount would remain in escrow until at least the next Sale.

In turn, Section 1(d)(iii)(B) establishes when the "remaining" Escrow Funds could be distributed. (*Id.* at 67–68.) Context makes clear that these funds could not be distributed until they were applied against the Tax Balance as described in § 1(d)(iii)(A) because § 1(d)(iii)(B) only permits the "remaining" Escrow Funds to be distributed to the Bank. If the entirety of the Escrow Funds would have been distributed (i.e., if they had not previously been applied against the Assignors' Tax Balance), this usage of "remaining" would be entirely superfluous, because the Escrow Funds would always "remain" in escrow until their distribution. In other words, § 1(d)(iii)(A) is a prerequisite to § 1(d)(iii)(B).

The Bank roots its incorrect interpretations of these provisions in the assumption that after a Qualifying Sale occurred, it "could immediately request disbursement of the Escrow Funds." (ECF No. 59, at 5.) The Bank cites to §§ 1(c)(iii)(B) and 1(d)(iii)(B) to support this proposition, but it provides no persuasive explanation for how these provisions support this assertion. Neither section does.

Section 1(c)(iii)(B) is no help, because it merely defines "Qualifying Sale." It says nothing about how escrow funds were to be distributed. The conditions of distribution other than for certain taxes are found entirely within § 1(d)(iii)(B), which says as follows:

> Upon written instruction from the [Bank] to the Escrow Agent of either or that either (1) (a) a Qualifying Sale or (b) a final determination of the Appraisal Amount has occurred under this Assignment and each of the Other Assignments (as such terms are defined herein), or (2) the ninth anniversary of the date of this Assignment has occurred, the Escrow Agent shall release to [the Bank], by wire transfer to an account or accounts designated by [the Bank], the remaining balance of the Escrow Funds.

(ECF No. 60-38, at 67–68). The Court can find no way to interpret the "of either or that either" phrase that comports with both grammar and logic. Regardless, as will be explained below, the presence of this nonsensical phrase does not disrupt the clarity of the *meaning* of the language in § 1(d)(iii)(B) because this section cannot reasonably be read to support any alternative outcome than the one described below.

The Court begins with the grammar of this sentence. "Either" is a word that is a chameleon as it can act in the role of multiple parts of speech, depending on the words that surround it. *See* Merriam-Webster, https://www.merriam-webster.com/dictionary/either (last visited Dec. 2, 2019). "Either" can immediately precede a noun in the form of an adjective. *See id.* (definition one). For example, "I did not want to go to either restaurant." However, such a noun cannot be preceded by a definite article. One could not say "I did not want to go to either a

restaurant" or "I did not want to go to either the restaurant." It can precede a noun as a part of the phrase "either of" where it acts as a pronoun. *See id.* (definition two). For example, "I did not want to go to either of the restaurants." "Either" can also precede a list of options where it plays the role of a conjunction. *See id.* (definition three). For example, "I did not want to go to either the café or the diner."

Two things are apparent in any of these forms. First, "either" always connotes a selection between two or more options. Even when it precedes only one noun, "either" combined with the noun conveys the *meaning* of multiple options from which there exists some sort of choice. Second, "either" usually must immediately precede the objects, or the phrases including the objects, with which it is associated. There cannot be random words between "either" and its objects.

There is one other form of "either" that is relevant here. "Either" can act as a pronoun that refers back to previously referenced nouns.[5] For example, "Sally invited me to go to the café and to the diner, but I did not want to go to either." The Court refers to this as a "referent either," and, unlike the other forms of "either" described above, it *follows* the nouns to which it refers.

Two other words in § 1(d)(iii)(B) —"of" and "that"—require explanation. "Of" is a function word that can serve many different purposes, but it most commonly precedes a noun. *See* Merriam-Webster, https://www.merriam-webster.com/dictionary/of (last visited Dec. 2, 2019). Similarly, the phrase "of either" must precede a noun (unless it is a referent either), but that noun cannot be part of a verb phrase without an intervening "that." For example, one can say "The restaurant's décor reminded me of either a lounge or a nightclub." Or one can say "The restaurant's décor reminded me of either a lounge or a nightclub that sells food." But one could

---

[5] The Bank is wrong to assume that "either" must precede its object. (ECF No. 61, at 10–11.)

not say "The restaurant's décor reminded me of either a lounge or a nightclub sells food." Removing the "that" severs the connection between the verb phrase and the rest of the sentence, and it leaves the verb phrase ("sells food") without any apparent subject.

"That" can also serve many purposes, but less so when it is used as a conjunction as it is used here ("Upon written instruction . . . that . . . ."). When used in this manner, "that" must precede a verb phrase. *See* Merriam-Webster, https://www.merriam-webster.com/dictionary/that (last visited Dec. 2, 2019). One can say, "Sally told me that either the diner or the café takes reservations," but one could never say "Sally told me that either the diner or the café" without adding a verb phrase, too.

These foundational principles provide the basis for parsing the sentence at issue in § 1(d)(iii)(B). That sentence consists of six key parts: 1) the "of either" phrase, 2) the "that either" phrase, 3) subsection 1(a) ("a Qualifying Sale"), 4) subsection 1(b) ("a final determination of the Appraisal Amount"), 5) subsection 1's verb clause ("has occurred under this Assignment and each of the Other Assignments"), and 6) subsection 2 ("the ninth anniversary of the date of this Assignment has occurred").

Beginning with part one, because of the "of," the phrase most logically precedes a noun and because of the "either" it must precede multiple nouns[6] unless it is a "referent either." Turning to part two, "that" is a conjunction so a verb phrase must follow, and because of the "either," again, this phrase must precede multiple nouns.

---

[6] The subsequent nouns in the sentence are all singular and definite ("*a* Qualifying Sale," "*a* final determination," and "*the* ninth anniversary" (emphases added)). Thus, none of them conveys the meaning of multiple options as in sentences like "I did not want to go to either restaurant or "I did not want to go to either of the restaurants." One could not say "I did not want to go to either the restaurant" where "either" is followed only by one singular, definite noun.

Focusing on part one (and putting a pin in part five for a moment), because parts three and four are nouns joined grammatically together by "or," both of them can be the object of part one—and both *must* be. There are only three nouns in this latter part of the sentence that can potentially serve as the objects of "either"—parts three, four, and six. However, the noun in part six ("the ninth anniversary") cannot be the object of part one because it is necessarily attached to the "has occurred" verb phrase at the end of part six. As explained above, "of either" cannot precede a noun that contains a verb phrase without an intervening "that," and there is no such "that" here. This leaves parts three and four as the only potential options.

In addition, part one requires an object that consists of either one indefinite noun (like "restaurant") without a verb phrase or at least two definite nouns without verb phrases. Because neither of the two remaining nouns (parts three and four) is indefinite, *see supra* note 6, the object of part one must consist of at least two nouns. And because parts three and four are the only nouns available, they both must comprise the object of part one.

Turning the focus to part two ("that either") and taking the pin out of part five, if part five modifies the nouns in both parts three and four, either of them can be the object of part two—and at least one of them *must* be. This is so because part two must precede at least two nouns (for the same reasons why part one must), and, again, there are only three relevant nouns that occur later in the sentence (in parts three, four, and six).

This is where "of either" and "that either" collide. Unless one of these "eithers" is a "referent either," each of these phrases must precede at least two nouns, assuming the available nouns are all singular and definite (as all of the nouns at issue here are). But there are not enough nouns to fulfill the grammatical requirement for neither to be a "referent either." Because the sentence has two "eithers," it requires at least four nouns—but there are only three. It thus cannot

be the case that both "eithers" refer to the later nouns in the sentence. The first "either" must be a "referent either" and the second "either" must refer forward.[7] There is a second rule of grammar that compels this conclusion: the first "either" cannot refer to later nouns in the sentence because the "or that either" phrase obstructs its ability to do so. It cannot be the case that the first "either" jumps over the second "either" to apply to some words farther downstream. It is grammatically improper.

Because the "either" in part one must be a "referent either," that begs the question of to what it refers. It cannot be referring to anything prior to § 1(d)(iii) for two reasons. First, that would not make contextual sense based on how the sections are physically arranged in the Assignments. That is, it would not make sense to refer back to something in an entirely different section without an explicit reference.[8] Second, so much space would have elapsed since the reference that it would be grammatically impossible for any reader to match the "referent either" to the reference. Accordingly, the "either" must refer to an earlier part of § 1(d)(iii).

Because of the grammatical rule that a "referent either" requires the existence of multiple nouns, it cannot refer to anything in § 1(d)(iii)(A) because nothing in that section presents multiple options to which the "either" could possibly be referring. Thus, the only possible reference is the very first sentence of § 1(d)(iii): "The Escrow Funds shall only be distributed and released as set forth either in the Other Assignments or as follows . . . ."

---

[7] The second "either" cannot be a referent either. Context makes clear that the "that" is a conjunction, so it *must* be followed by a noun clause that includes a verb. *See* Merriam-Webster, https://www.merriam-webster.com/dictionary/that (last visited Dec. 2, 2019).

[8] Each Assignment's use of almost a dozen defined terms demonstrates multiple examples of clear intentions to refer to other sections of the Assignment. In addition, various sections make explicit references to other sections of the Assignment. (*See, e.g.*, ECF No. 60-38, at 11 (reference in § 1(c)(v) to § 1(c)(iv)), 12 (reference in § 1(d)(i) to Schedule 1(d)), 13 (reference in § 1(2)(c) to Schedule 2(c)).)

By process of elimination, if the "of either" phrase has any meaning at all, the two options in the first sentence of § 1(d)(iii) ("in the Other Assignments" or "as follows") must be the options to which the first "either" is referring. This is the only possible grammatical interpretation. Accordingly, the existence of this "either" means that the Escrow Funds can be disbursed either 1) "as set forth . . . in the Other Assignments" or 2) "as follows." However, while this makes some grammatical sense—even though it is a very awkward construction—it still lacks any logical sense. This is because the "of either" would now be an internal reference that creates a circular loop and serves no apparent purpose. The "as follows" option refers to the (A) and (B) provisions of § 1(d)(iii). And the "as set forth . . . in the Other Assignments" option refers to the same exact section in the other fifty-nine Assignments, since all sixty Assignments have identical sections 1(d)(iii). As a result, the "of either" phrase, which is itself located within provision (B), is referring to choices that themselves are referring to the choice that the "that either" phrase already defines. If the "of either" phrase has any meaning at all, it is redundant and serves no apparent purpose, but the Court concludes that this is the only grammatical way to read the sentence.

If this tedious explanation proves one thing, it proves that § 1(d)(iii) is poorly drafted; however, it does not impede the Court's ability to interpret the Assignments, since this contractual provision can only grammatically be read to produce one outcome. But given the poor drafting, in interpreting the "of either" phrase, the Court must choose between nonsensical grammar and illogical surplusage. No native speaker of English would ever intentionally write this sentence.

Ohio treats a scrivener's error in a contract the same as a mutual mistake. *Apex Energy Grp., LLC v. Apex Energy Sols. of Cincinnati, LLC*, No. 1:12CV466, 2013 WL 394464, at *6

(S.D. Ohio Jan. 31, 2013) (citing Ohio cases); *ArcelorMittal Cleveland, Inc. v. Jewell Coke Co.*, 750 F. Supp. 2d 839, 846–47 (N.D. Ohio 2010) (same). A court may reform a contract where it finds by clear and convincing evidence that the parties have made a scrivener's error and that the error does not express the actual intention of the parties. *See ArcelorMittal*, 750 F. Supp. 2d at 847. Here, the Court finds by clear and convincing evidence that the lack of a grammatical way to read the Assignments as written can only be due to a scrivener's error. Without that scrivener's error, § 1(d)(iii)(B) makes grammatical and logical sense. It reads as follows:

> Option 1: Upon written instruction from the [Bank] to the Escrow Agent ~~of either or~~ that either (1) (a) a Qualifying Sale or (b) a final determination of the Appraisal Amount has occurred under this Assignment and each of the Other Assignments (as such terms are defined herein), or (2) the ninth anniversary of the date of this Assignment has occurred, the Escrow Agent shall release to [the Bank], by wire transfer to an account or accounts designated by [the Bank], the remaining balance of the Escrow Funds.

The existence of this error and the lack of clarity in § 1(d)(iii)(B) might make it seem as if this sentence is ambiguous. It is not. An unclear sentence, or an awkward sentence, is not necessarily an ambiguous one. A contract is only ambiguous if a reviewing court cannot give a definite legal meaning to the terms of the contract. *Ohio*, 787 F.3d at 353. As the above analysis shows, there is a definite legal meaning of the Assignments compelled by the rules of grammar. Striking the "of either" phrase as a scrivener's error results in the same interpretation of § 1(d)(iii)(B) as if it is left in, but it eliminates the grammatical and logical awkwardness of the original provision.

The Court now addresses the Bank's alternative reading of this provision. The Bank argues that part five ("has occurred under this Assignment") only modifies part four (the appraisal) and that it does not modify part three (Qualifying Sale). (ECF No. 61, at 10–11.) This argument implicitly relies on the rule of the last antecedent.

The rule of the last antecedent provides that "a limiting clause or phrase" (here, part five) "should ordinarily be read as modifying only the noun or phrase that it immediately follows" (here, part four). *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). However, this is not an absolute rule. *Id.* Rather, it can "be overcome by other indicia of meaning . . . ." *Id.* Furthermore, because this is a grammatical rule, *id.*, it makes sense that adherence to it is inappropriate if it would destroy the grammaticality of a sentence.

The Bank claims that the "of either" phrase supports its reading of the sentence, arguing that "of either" must apply to part three ("a Qualifying Sale") while "that either" must apply to part four (the appraisal). (*Id.*) The Bank advances this interpretation in order to support its contention that it was entitled to seek a distribution of the Escrow Funds after *any* Qualifying Sale, rather than being required to wait for the occurrence of Qualifying Sales (or appraisals) under all sixty Assignments.

This interpretation is not supported by the language of the Assignments or grammatical rules. For one, the Bank has no explanation for how the "of either" can magically skip over the "or that either" phrase to apply to "a Qualifying Sale" or how the "that either" phrase can magically skip over "a Qualifying Sale" to apply to subsection 1(b). For another, the Bank's interpretation runs into one of the issues that the Court identified above. There are not enough nouns. The "of either" phrase *must* refer to at least two nouns, but there is no second noun to which it could possibly refer and the Bank fails to identify one.

In other words, in order for the Bank's interpretation to result in a grammatically correct sentence, the paragraph would have to be rewritten as follows:

Upon written instruction from the [Bank] to the Escrow Agent of either ~~or that either~~ (1) ~~(a)~~ a Qualifying Sale or ~~(b)~~ **(2) that either (a)** a final determination of the Appraisal Amount has occurred under this Assignment and each of the Other Assignments (as such terms are defined herein), or ~~(2)~~ **(b)** the ninth anniversary of

the date of this Assignment has occurred, the Escrow Agent shall release to [the Bank], by wire transfer to an account or accounts designated by [the Bank], the remaining balance of the Escrow Funds.

This is a major re-write of the paragraph, and it cannot be. The Bank's construction not only requires that the words be rearranged, but it also does violence to the structure of the paragraph, since the (1)/(2) and (a)/(b) breakdown would have to be altered in order to accommodate the Bank's reading. Without these dramatic alterations, the Bank's reading is not a grammatical way to read the paragraph. The Bank is not at liberty to rewrite the contract in this manner, and neither is the Court.

The Bank's argument is also undermined by the Assignments' separate definitions for "Escrow Amount" and "Escrow Funds." The contract specifically defines "Escrow Funds" as being the "Escrow Amount" figures from all sixty Assignments; then the escrow distribution provision refers to distribution of the "Escrow Funds" (i.e., the cumulative Escrow Amounts under all sixty Assignments) not the "Escrow Amount" (i.e., the Sale Proceeds under a single Assignment). This distinction would not be necessary if the funds were intended to be distributed after each Qualifying Sale, rather than after all of the Qualifying Sales.

In addition, as was explained above, and as the Bank acknowledges, § 1(d)(iii)(A) specifically contemplates circumstances in which there will be Escrow Funds available to pay a Tax Balance after a Sale that results in a loss. However, under the Bank's reading of § 1(d)(iii)(B), the availability of Escrow Funds to pay the Tax Balance would essentially rely on the benevolence of the Bank. That is, there would only ever be money in escrow if the Bank chose not to empty the escrow account after each Qualifying Sale. Section 1(d)(iii)(A) would be rendered relatively useless.

Given the interpretive necessities outlined above, it must be the case that the verb clause in part five of the sentence modifies both parts three ("Qualifying Sale") and four (the appraisal).

The rule of the last antecedent must give way to context and the laws of grammar. Thus, § 1(d)(iii) makes clear that the Escrow Funds could only be released prior to September 30, 2018, (eight years from the date of the Assignments) if sixty conditions had been met—some combination of Qualifying Sales or appraisals under all sixty Assignments.

This conclusion also undercuts the Bank's argument as to the Tax Balance provision in § 1(d)(iii)(A). The Bank highlights the references in § 1(d)(iii)(A) to "the Company" and "such Sale" to argue that the Tax Balance coverage is assessed on a "Company-by-Company and property-by-property basis." (ECF No. 59, at 15.) However, this ignores that § 1(d)(iii)(A) says that if "the Escrow Funds have a positive balance at the time of *any* Sale" (emphasis added), then the Escrow Funds must be applied towards any taxes. As the Bank highlights, the Assignments frequently reference "a Sale" or "such Sale," which obviously refer to particular sales as opposed to any potential sale. Thus, the usage of "any" in § 1(d)(iii)(A) is a conspicuous and clear attempt to distinguish this provision from provisions referencing particular Sales. Section 1(d)(iii)(A) is clear that the Tax Balance is calculated individually for each Sale but that if the Escrow Funds *ever* have a positive balance at the time of *any* Sale, that balance (which cannot be released until the conditions in (iii)(B) are met) must be applied towards the Tax Balance.

Nevertheless, another part of the Bank's argument as to the Tax Balance provision is well taken. This argument pertains to the last three lines of § 1(d)(iii)(A), which say that no Company or Assignor is ever entitled to an amount in excess of the Escrow Funds at the time of the Sale. The Bank argues that if the Escrow Funds total $0 at the time of a Sale, then a Company or Assignor would not be entitled to any money from the escrow account. This is correct.

The Court understands the referenced provision to mean two things—1) the Company or Assignor was not entitled to wring more money out of the Bank once the amount in escrow was

depleted (i.e., the escrow account was the only source of funds) and 2) this only went one way—money from earlier Sales that was leftover in escrow could be used to pay off the taxes on later Sales, but the Assignors could not go back and apply money from later Sales towards taxes on earlier Sales that had not been paid due to insufficient escrow funds.

The Assignors argue that the Escrow Funds "are available to pay taxes at any time." (ECF No. 62, at 10.) But that is not what the last three lines of § 1(d)(iii)(A) say. That provision explicitly says that the Company and Assignor are not entitled to any "amount in excess of the Escrow Funds held by the Escrow Agent *at the time of such Sale*" (emphasis added). This puts a definite limitation on the application of the escrow money towards the Tax Balance. If the amount in escrow at the time of a particular Sale is less than the Tax Balance after a particular Sale, the escrow money will be depleted to pay down the Tax Balance; however, any remaining Tax Balance will persist with no further help from the money in escrow. The Assignors cannot return later to the escrow account to pay down the Tax Balance of an earlier transaction.

At the time of the Old Bridge Sale, there were $132,099 in Escrow Funds in the escrow account. The Bank has not offered any evidence to dispute the Assignors' calculations that the Old Bridge Sale resulted in a Tax Balance of over $2 million, which would have resulted in a liquidation of the escrow account. That is, the $132,099 in Escrow Funds should have been used to pay down the taxes that resulted from the Old Bridge Sale. Accordingly, the Assignors were entitled to have the Escrow Funds issued to them as partial payment on the taxes for Old Bridge.

However, after the loss on the Old Bridge Sale depleted the Escrow Funds, the excess tax balance on the Old Bridge Sale was irrelevant to the Assignments, and no future Escrow Funds could be used towards that debt. This is because, under § 1(d)(iii)(A), only the Escrow Funds "at the time of such Sale" could be applied towards the Tax Balance, and no matter how much

money might have been added to the escrow account from later sales, that money would not have been in the escrow account "at the time of such Sale" of Old Bridge. Accordingly, any proceeds from the later Harrisburg, Union Hill, and English Village Qualifying Sales were required to be escrowed, and they could not be applied towards the Old Bridge taxes because the money from these Sales was supposed to be escrowed after "the time of [the Old Bridge] Sale."

Although the Assignors' and the Bank's numbers and calculations differ, the uncontested facts show that the Sales of Harrisburg, Union Hill, and English Village were profitable and generated Sale Proceeds that should have been escrowed. Accordingly, barring a finding of waiver or laches, the Assignors were required to escrow the Sale Proceeds from these transactions.

The Assignors are entitled to the $132,099 in Escrow Funds to apply towards the Tax Balance resulting from the Old Bridge Sale. To the extent that the Assignors only seek a return of the $132,099 currently in escrow, Plaintiffs' Motion for Summary Judgment as to the third component of Count One is **GRANTED** and Defendant's Motion for Summary Judgment as to this component is **DENIED**.

Subject to the discussion below, the Sales of Harrisburg, Union Hill, and English Village generated Sale Proceeds that should have been escrowed with the exact amount to be determined. However, as is explained below, the Assignors' arguments as to why the English Village Sale Proceeds should not be escrowed fail. Thus, at a minimum the Assignors must escrow the English Village Sale Proceeds as calculated in accord with this Opinion. For this reason, Plaintiffs' Motion for Summary Judgment as to the second component of Count One is **DENIED** and Defendant's Motion for Summary Judgment as to this component is **GRANTED**.

## C. Waiver, Estoppel, Ratification, and Laches

This does not mean, however, that the Bank is necessarily entitled to all that it seeks. The Assignors argue that the Bank has lost its ability to enforce the contested provisions of the Old Bridge, Harrisburg, and Union Hill transactions. The Court now turns to the Assignors' various claims that the Bank has lost its right to enforce the Assignment provisions regarding calculation of the Sale Proceeds for the Union Hill, Harrisburg, and Old Bridge transactions.

A party may waive a contractual provision by voluntarily relinquishing a known right. *PHH Mortg. Corp. v. Ramsey*, 17 N.E.3d 629, 634 (Ohio Ct. App. 2014). Waiver must be proven by a "'clear, unequivocal decisive act'" by the waiving party. *Id.* (quoting *EAC Props., LLC v. Brightwell*, No. 10AP-853, 2011 WL 1944101, at *5 (Ohio Ct. App. May 17, 2011)). A contract provision may be waived expressly or impliedly. *Id.* Waiver by estoppel may occur when a party acts inconsistently with an intent to claim a right, and this results in the other party having been misled and prejudiced. *Id.* In other words, waiver by estoppel is based not on the waiving party's intent but by the waiving party's conduct and the resulting effect of that conduct. *Id.*

There is no evidence that the Bank objected to the calculations regarding the Harrisburg, Old Bridge, or Union Hill transactions until September 12, 2016, three months after the Bank received the Assignors' final calculations regarding the Union Hill transaction, and over a year after the Bank received the Harrisburg and Old Bridge calculations. The Assignors argue that the Bank's silence regarding these calculations constitutes a waiver, (ECF No. 60, at 42), while the Bank argues that this conduct (or lack thereof) is insufficient to constitute a waiver, (ECF No. 59, at 17–18). Whether this conduct constitutes a waiver—either an intentional waiver by implication or a waiver by estoppel—is a question of fact. *See PHH Mortg.*, 17 N.E.3d at 634.

Summary judgment is not appropriate on these issues because there remain factual questions about whether the Bank's conduct constitutes a "clear, unequivocal" waiver and whether the Assignors have been prejudiced (as is necessary to prove waiver by estoppel). Plaintiffs' and Defendant's Motions for Summary Judgment as to Counts Two and Four are **DENIED**.

The Assignors also seek a declaration that the Bank ratified their calculations. This doctrine does not apply here. The Assignors cite one case in support of their theory of ratification, and it involves the ratification of an agent's acts by a principal. *See Paterson v. Equity Tr. Co.*, No. 11CA009993, 2012 WL 690642, at *6 (Ohio Ct. App. Mar. 5, 2012) ("A principal may ratify the unauthorized acts of his agent . . . ."). While a ratification defense is not necessarily dependent on a principal-agent relationship, it does appear to require the existence of a third party. *See Gomez v. Huntington Tr. Co*, No. 3:98CV7436, 2001 WL 1112690, at *3 (N.D. Ohio Aug. 28, 2001) (finding ratification defense available under Ohio law where a person affirms the prior act of a third party, even absent a principal-agent relationship). That is not the case here, where the Assignors are arguing that the Bank ratified *their* conduct rather than the act of a third party. The Assignors cite no law on point to support their argument. Plaintiffs' Motion for Summary Judgment as to Count Three is **DENIED**, and Defendant's Motion for Summary Judgment as to Count Three is **GRANTED**.

Finally, the Assignors argue that laches bars the Bank's ability to challenge their calculations. Under Ohio law, a claim of laches requires proof of unreasonable delay, the absence of an excuse for the delay, actual or constructive knowledge of the wrong, and prejudice to the other party. *State ex rel. Polo v. Cuyahoga Cty. Bd. of Elections*, 656 N.E.2d 1277, 1279 (Ohio 1995). "A determination on a defense based upon laches is primarily a question of fact to be resolved based upon [the] special circumstances of each case." *Bank One Tr. Co. v. LaCour*,

721 N.E.2d 491, 496 (Ohio Ct. App. 1999); *accord Gen. Elec. Co. v. Sciaky Bros.*, 304 F.2d 724, 727 (6th Cir. 1962); *SCI Sys., Inc. v. Solidstate Controls, Inc.*, 748 F. Supp. 1257, 1265 (S.D. Ohio 1990) ("Whether or not a particular claim is barred by laches necessarily depends upon the particular facts and circumstances which bear on the issues of the reasonableness of any delay and the extent of prejudice to the party invoking the laches defense."). As with estoppel by waiver, this is an intensely factual analysis requiring the Court to determine the "reasonableness" of the Bank's delay and the extent of prejudice to the Assignors on a full record.

Plaintiffs' and Defendant's Motions for Summary Judgment as to Count Five are **DENIED**.

### D.     Contractual Breaches

In Counts One through Three of the Bank's counterclaims, the Bank alleges three types of contractual breaches by each of the Assignors and the three party Companies—a failure to provide timely notice of the Sales of English Village, Harrisburg, and Union Hill; a failure to provide timely notice to the Bank of the material facts of the Sale and the calculation of the Sale Proceeds for English Village, Harrisburg, and Union Hill; and the failure to escrow the money from the Sales of English Village, Harrisburg, and Union Hill. In Count One, the Bank also alleges a fourth contractual breach by all of the Assignors and by Stanbery English Village, LP, for the failure to provide an accurate statement of the closing costs of the English Village Sale.

These alleged breaches are based on §§ 1(b) and 1(c)(ii) of the Assignments. Section 1(b) required the Assignors to 1) notify the Bank thirty days prior to any Sale and 2) provide the Bank, at least ten days prior to a Sale "or as soon thereafter as the relevant calculations [were] available[,]" documentation setting forth "the material facts" of the Sale and a calculation of the

Sale Proceeds. (ECF No. 60-38, at 64.) Section 1(c)(ii) required the Assignor and the Company to transfer any Sale Proceeds into escrow within three days of receipt. (*Id.* at 65.)

Proof of a breach of contract under Ohio law requires proof that a contract existed, that the nonbreaching party performed its contractual obligations, that the other party failed to fulfill its contractual obligations without excuse, and that the nonbreaching party suffered damages due to the breach. *Norfolk S. Ry. Co. v. Allied Erecting & Dismantling Co.*, 775 F. App'x 178, 190 (6th Cir. 2019).

At issue here is not just whether the Assignors breached the Assignments, but also the materiality of any such breaches. "[A] party does not breach a contract when such party has substantially performed the terms of the contract, and mere nominal, trifling or technical departures are not sufficient to constitute breach." *Hansel v. Creative Concrete & Masonry Constr. Co.*, 772 N.E.2d 138, 141 (Ohio Ct. App. 2002). However, the part of the contract left unperformed "must not destroy the value or purpose of the contract." *Id.* If the breaching party has substantially performed, the nonbreaching party would be entitled to "a recovery of the contract price less allowance for defects in performance or damages for failure to strictly comply with the contract." *Id.*

In considering whether a failure to perform is material, a court should consider the extent to which the injured party will be deprived of a reasonably expected benefit and can be adequately compensated for the deprivation, the extent to which the breaching party will suffer forfeiture, the likelihood of curing the failure to perform, and whether the breaching party acted in accord with standards of good faith and fair dealing. *Kersh v. Montgomery Developmental Ctr., Ohio Dep't of Mental Retardation & Developmental Disabilities*, 519 N.E.2d 665, 668 (Ohio Ct. App. 1987) (citing Restatement (Second) of Contracts § 241 (Am. Law Inst. 1981)).

### 1.    The Transactions

Based on the evidence in the record, the Assignors did not notify the Bank of the fact of the English Village Sale, the material facts of the Sale, or a calculation of the Sale Proceeds until mere hours before the Property was sold. The Assignors also did not escrow any money after this transaction. Finally, the Assignors informed the Bank that the transaction involved closing costs totaling $6.5 million. (ECF No. 59-16, at 7.) However, the Bank's expert has calculated the costs of the transaction to be less than half this amount. (ECF No. 59-14, at 18.)

With regard to Harrisburg, the Assignors notified the Bank of the Sale on April 28, 2015. The Sale occurred around May 28, 2015, which would be thirty days after the notice; however, the precise date of the Sale is not clear. The Assignors did not provide the Bank with calculations for the Harrisburg Sale until June 10, 2015. The Assignors did not escrow any money after this transaction.

Finally, the Assignors notified the Bank of the impending sale of Union Hill, and provided preliminary tax calculations, on March 9, 2016. The sale subsequently occurred on March 30, 2016. On June 15, 2016, the Assignors provided updated calculations to the Bank. The Assignors did not escrow any money after this transaction.

### 2.    The Alleged Breaches

Beginning with the thirty-days' notice requirement, it is indisputable that the Assignors did not provide the Bank with thirty days' notice of the English Village or Union Hill Sales. For the Harrisburg property, there is insufficient evidence as to whether the Assignors did give the Bank thirty days' notice of the Sale. Regardless, the key question with respect to all three transactions is whether the breaches were material. The Assignors contend that the breaches were immaterial because the Bank had no ability or authority to intervene in, influence, or stop any

Sale. (ECF No. 62, at 12–13.) The Bank offers nothing to rebut this. Rather, the Bank contends, without explanation, that earlier notice would have given the Bank more information and time to review the transactions. (ECF No. 66, at 8.) There is no evidence to support this argument.

The Bank took three months (and a change in outside counsel) to raise any issues with respect to the Union Hill calculations and took over one year to object to the Harrisburg calculations. It strains credulity to argue that a few additional days before the sales would have mattered. In addition, because the Bank had no ability or authority to intervene in, influence, or stop any Sale, there is nothing the Bank could have done even if it had objected.

Any breach of the thirty-days' notice requirement was not material. The Counter-Defendants' and Third-Party Defendants' Motion for Summary Judgment as to these breaches is **GRANTED**, and the Counter-Plaintiff's Motion for Summary Judgment as to these breaches is **DENIED**.

The next alleged breach concerns the § 1(b) requirement that the Assignors were to notify the Bank at least ten days prior to a Sale "or as soon thereafter as the relevant calculations [were] available" of the "material facts" of the Sale and a calculation of the Sale Proceeds. None of the final calculations were provided prior to the Sale of any of the Properties. However, unlike with the thirty-day requirement, this does not automatically constitute a breach because the Assignments specifically contemplate that the information might not be available at that point in time. Rather, the Assignments allow for the "material facts" of the Sale and the Sale Proceeds calculations to be provided "as soon . . . as the relevant calculations [became] available." The parties have not provided the Court with evidence of when these calculations were available. However, as with the thirty-day notice requirement, the Court finds that any breach of § 1(b) was not material based on the Bank's lack of any reasonable explanation of harm that it suffered as a

result of such a breach. The Counter-Defendants' and Third-Party Defendants' Motion for Summary Judgment as to these breaches is **GRANTED**, and the Counter-Plaintiff's Motion for Summary Judgment as to these breaches is **DENIED**.

The only other § 1(b) breach that the Bank alleges is with respect to English Village only. The Bank alleges that the Assignors provided inaccurate information regarding the closing costs for English Village. However, the evidence provided to the Court consists of competing closing cost figures without any way for the Court to determine which is correct. The parties barely address this allegation in their papers. Thus, the Counter-Defendants' and Third-Party Defendants' and Plaintiff's Motions for Summary Judgment as to this aspect of Counterclaim Count One are **DENIED**.

The final breach that the Bank alleges concerns the failure of the Assignors to escrow any of the money from the English Village, Harrisburg, or Union Hill transactions. As was already discussed above, because of their incorrect calculations of the Sale Proceeds and their flawed assumption that any money made on these transactions could permissibly be applied toward the losses on the Old Bridge transaction, the Assignors failed to escrow any money from the Sales of English Village, Harrisburg, or Union Hill. This was due to the Assignors' erroneous interpretation of the Assignments, and the Assignors were—and are—obligated to escrow money from the Sales of each of these Properties unless the Bank has lost its ability to enforce this provision of the Assignments.

These breach allegations are similar to the Assignors' waiver and laches arguments, although they are broader in scope. Regardless, the Assignors have asserted the same defenses of waiver and laches in the form of affirmative defenses to the Bank's counterclaims. (Answer to Counterclaim, at 27, ECF No. 15.) As discussed above, the Assignors argue in Counts Two,

Four, and Five of the Complaint that even if they have breached the Assignments, the Bank has waived the ability to enforce this aspect of the contracts, or is barred by laches from doing so. As a result, with respect to the Harrisburg and Union Hill transactions, because the waiver and laches issues require factual determinations not suitable for summary judgment, the parties are not entitled to summary judgment on whether the Assignors breached the Assignments' requirement that they escrow the Sale Proceeds within three days. Accordingly, Counter-Plaintiff's and Counter-Defendants' and Third-Party Defendants' Motions for Summary Judgment are **DENIED** as to these aspects of Counterclaim Counts Two and Three.

Although it is not part of the Assignors' original Complaint, the Assignors also argue that the Bank has waived its ability to enforce any breach of the requirement of the Assignments to escrow the Sale Proceeds from the English Village transaction within three days. (ECF No. 62, at 12–13.) The facts do not support this argument. The Bank raised objections to the English Village calculations less than four weeks after it received them. While the Bank's prior conduct creates a disputed factual issue as to whether it waived enforcement with respect to the Harrisburg and Union Hill transactions, this conduct is not relevant to the English Village transaction. This is because the Assignments specifically say that no waiver "shall be deemed to be a waiver of any subsequent breach or default." (ECF No. 60-28, at 72.) Accordingly, the Court can and does decide as a matter of law that the Bank has not waived its right to enforce the escrow provision with respect to English Village. Counter-Plaintiff's Motion for Summary Judgment is **GRANTED** as to this aspect of Counterclaim Count One, and Counter-Defendants' and Third-Party Defendants' Motion for Summary Judgment is **DENIED**. The Assignors are **ORDERED** to escrow the properly calculated Sale Proceeds from the English Village transaction.

E.      **The Ohio Uniform Fraudulent Transfer Act**

Finally, the Bank alleges in Counterclaim Counts Six through Eight that the Assignors and each of the Companies have violated the UFTA through the Companies' transfers to the Assignors of the Sale Proceeds from the sales of English Village, Harrisburg, and Union Hill. The Bank has not moved for summary judgment on these claims, but the Assignors and the Companies have. First, the Assignors and the Companies argue that the Bank is not a creditor under the UFTA because the Assignors and the Companies do not owe the Bank any money. This argument can be disposed of right away—the Court has already found that the Assignors' and the Companies' Sale Proceeds calculations are incorrect, and, barring waiver or laches, they are obligated to escrow additional money (which, ultimately, would be paid to the Bank). The Assignors and the Companies are debtors within the meaning of the UFTA, and the Bank is a creditor.

Second, the Assignors and the Companies argue that the Bank has offered no evidence that the Assignors or the Companies acted with fraudulent intent. A transfer is "fraudulent" under § 1336.04(A)(1) if the debtor makes the transfer "[w]ith actual intent to hinder, delay, or defraud" a creditor or, under § 1336.04(A)(2), "[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation . . . ." Ohio Rev. Code Ann. § 1336.04(A) (West 2019). In the case of § 1336.04(A)(2), it must be the case that either "[t]he debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction" or "[t]he debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." *Id.* § 1336.04(A)(2). While the Bank cursorily argues that the Companies are "liable to the Bank" under both provisions, the Bank does not

seriously attempt to defend a claim under subsection (A)(2). (*See* ECF No. 61, at 19.) Nor could it; the Bank offers no evidence that the Assignors and the Companies had unreasonably small assets in relation to the Sales or that the Assignors or the Companies intended to incur debts beyond their ability to pay.

Instead, the Bank relies primarily on subsection (A)(1). In weighing a party's intent under subsection (A)(1), "consideration may be given to all relevant factors, including, but not limited to, the following: (1) Whether the transfer or obligation was to an insider; (2) Whether the debtor retained possession or control of the property transferred after the transfer; (3) Whether the transfer or obligation was disclosed or concealed; (4) Whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit; (5) Whether the transfer was of substantially all of the assets of the debtor; (6) Whether the debtor absconded; (7) Whether the debtor removed or concealed assets; (8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred; [and] (11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor." Ohio Rev. Code Ann. § 1336.04(B).

The burden to prove fraud rests on the Bank, but the so-called "badges of fraud" identified in § 1336.04(B) may give rise to an inference or presumption of fraud that then shifts the burden of production to the Assignors and the Companies to prove that the transaction was not fraudulent. *See Cardiovascular & Thoracic Surgery of Canton, Inc. v. DiMazzio*, 524 N.E.2d 915, 918 (Ohio Ct. App. 1987). There appears to be a consensus among Ohio's intermediate

appellate courts that proof of three of the eleven badges of fraud is sufficient to warrant an inference of fraudulent intent. *See, e.g.*, *Ohio Pickling & Processing, LLC v. Vella*, No. L-16-1276, 2017 WL 3575819, at *3 (Ohio Ct. App. Aug. 18, 2017) (6th District); *Bank One, Columbus, NA v. Plaza E., Inc.*, No. 97APE02-184, 1997 WL 710664, at *4 (Ohio Ct. App. Nov. 10, 1997) (10th District); *Profeta v. Lombardo*, 600 N.E.2d 360, 364 (Ohio Ct. App. 1991) (11th District); *McKinley Fed. Sav. & Loan v. Pizzuro Enters., Inc.*, 585 N.E.2d 496, 500 (Ohio Ct. App. 1990) (8th District). "[H]owever, even if the evidence establishes evidence of a sufficient number of badges, summary judgment is not proper if a genuine dispute exists about whether a transfer was supported by a reasonably equivalent value." *Individual Bus. Servs. v. Carmack*, No. 24085, 2011 WL 1457133, at *7 (Ohio Ct. App. Apr. 15, 2011); *accord Dolce v. Lawrence*, No. 98-L-080, 1999 WL 960572, at *5 (Ohio Ct. App. Sept. 30, 1999). This is because of the UFTA's safe harbor provision designating that a transfer is not fraudulent if it was conducted "in good faith and for a reasonably equivalent value . . . ." Ohio Rev. Code Ann. § 1336.08(A).

The Bank has the burden of proving fraud by clear and convincing evidence. *United States v. Berman*, 884 F.2d 916, 921 (6th Cir. 1989). Although this case is only at the summary judgment stage, ruling on a motion for summary judgment "necessarily implicates the substantive evidentiary standard of proof that would apply at a trial on the merits." *Anderson*, 477 U.S. at 252. Accordingly, "there is no genuine issue if the evidence presented . . . is of insufficient caliber or quantity to allow a rational finder of fact to find [fraud] by clear and convincing evidence." *See id.* at 254.

The Bank argues, and the Assignors and the Companies implicitly concede, that three of the badges of fraud are met here—the Sale Proceeds were transferred to insiders (i.e., the Assignors), these transfers involved substantially all of the assets of the Companies, and the

Companies were made insolvent by these transfers. (ECF No. 61, at 19–20; ECF No. 60, at 47.) This is sufficient to create a presumption of fraud.

However, the bottom line of § 1336.04(A)(1) is that a transfer is fraudulent only if it is made "[w]ith actual intent to hinder, delay, or defraud," and the statute directs the Court to look to "all relevant factors" in making this determination. The reason why these three badges of fraud are met here is because in the context of this case, the Assignors and the Companies are functionally the same. That is, the Assignments treat them exactly the same. (*See, e.g.*, ECF No. 60-38, at 64 (referring to Sale Proceeds "received by the Company and/or the Assignor" and obligating "[t]he Company and the Assignor" to provide information to the Bank), 65 (obligating the Assignor to cause the Company to put money into escrow), 67 (including taxes of the "Company or Assignor" in Tax Balance calculation)).) And these are all provisions to which the Bank agreed in executing these Assignments.

The Bank is grieved that the Companies have transferred money to the Assignors that should have been put into escrow, and now the Bank alleges fraud. But the facts do not support this allegation. The undisputed facts show that while the Assignors improperly calculated the Sale Proceeds and may have received more money than they were entitled under the Assignments, the Assignors were transparent in doing so. They apprised the Bank of the Sales and of their calculations, and while the Bank challenges the validity of these calculations, the Bank never offers any evidence that the Assignors' calculations were made with intent to hinder, delay, or defraud the Bank. The Bank has offered no evidence that the Companies and the Assignors did not, in good faith, act in accord with how they were interpreting the Assignments. It thus follows that the Bank has offered no evidence that the Companies and the Assignors acted with actual fraudulent intent.

Based on all of the circumstances, the Court is not convinced that there is sufficient evidence for a rational finder of fact to find by clear and convincing evidence that the Companies and the Assignors acted with the intent to hinder, delay, or defraud the Bank.

Accordingly, the Assignors' Motion for Summary Judgment on the UFTA claims (Counts Six through Eight) is **GRANTED**.

## V.    CONCLUSION

For the reasons set forth above, Plaintiffs'/Counter-Defendants'/Third-Party Defendants' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part, and Defendant's/Counter-Plaintiff's/Third-Party Plaintiff's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.

Given the above analysis and conclusions, the following issues remain in dispute for determination at trial:

1. Whether, due to intentional waiver (Complaint Count Two), waiver by estoppel (Complaint Count Four), or laches (Complaint Count Five) the Bank has lost its right to challenge the Assignors' Sale Proceeds calculations for the Old Bridge Sale;

2. Whether, due to intentional waiver (Complaint Count Two), waiver by estoppel (Complaint Count Four), or laches (Complaint Count Five) the Bank has lost its right to challenge a) the Assignors' Sale Proceeds calculations for the Harrisburg Sale and b) the failure by the Assignors and by Stanbery Harrisburg, LP, to escrow the Sale Proceeds from the Harrisburg Sale within three days of the Sale (Counterclaim Count Two);

3. Whether, due to intentional waiver (Complaint Count Two), waiver by estoppel (Complaint Count Four), or laches (Complaint Count Five) the Bank has lost its right to challenge a) the Assignors' Sale Proceeds calculations for the Union Hill Sale and b) the

failure by the Assignors and by The Shoppes at Union Hill, LLC, to escrow the Sale

Proceeds from the Union Hill Sale within three days of the Sale (Counterclaim Count

Three);

4. Whether the Assignors and Stanbery English Village, LP, breached § 1(b) of the

Assignments by failing to provide an accurate statement of the closing costs for English

Village (Counterclaim Count One); and

5. In the case of the Harrisburg and/or the Union Hill Sales, if the Bank has not lost its right

to challenge the Assignors' Sale Proceeds calculations or the Assignors' or the

Companies' failure to escrow the Sale Proceeds within three days, it also remains in

dispute how much money (if any) the Assignors are obligated to put into escrow

(Counterclaim Counts Two and Three).

**IT IS SO ORDERED**.


/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**