## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

P. JONATHAN MEYER, *et al.*,

      **Plaintiffs/Counter-Defendants,**

      **v.**

                     **:**

**BANK OF AMERICA, N.A.,**

      **Defendant/Counter-Plaintiff/Third-Party Plaintiff,**

                     **:**

      **v.**

**STANBERY ENGLISH VILLAGE, LP, *et al.*,**

      **Third-Party Defendants.**

**Case No. 2:18-cv-218**
**Judge Sarah D. Morrison**
**Magistrate Judge Kimberly A. Jolson**

### BENCH OPINION AND ORDER OF FINAL JUDGMENT

Plaintiffs P. Jonathan Meyer, Mark Pottschmidt, and Raymond Brunt ("Assignors") first brought suit for declaratory judgment in a contract dispute against Defendant Bank of America, N.A. (the "Bank") in state court on November 13, 2017. (Compl., ECF No. 11.) The Bank removed the action to this Court on March 14, 2018. (Notice of Removal, ECF No. 1.) Shortly thereafter, the Bank filed its Answer and Affirmative Defenses (Answer, ECF No. 3) and asserted

Counterclaims and a Third-Party Complaint, joining, *inter alia*[1], Third-Party

Defendants The Shoppes at Union Hill, LLC, Stanbery Harrisburg, LP, and

Stanbery English Village, LP (together with Assignors, the "Stanbery Parties")

(Countercl., ECF No. 4).

On December 2, 2019, this Court granted in part and denied in part each of

the parties' cross-motions for summary judgment. (December 2 Order, ECF No. 75.)

The case proceeded to a bench trial in November 2020 on liability and damages for

all remaining claims. (*See* December 2 Order, 37–38.) Post-trial briefs and proposed

findings of fact and conclusions of law have been submitted by the Stanbery Parties

(ECF Nos. 126, 132, 135) and the Bank (ECF Nos. 130, 133, 134). Upon review of

such filings, and pursuant to Federal Rule of Civil Procedure 52(a), the Court now

issues the following findings of fact and conclusions of law.

## I.    FINDINGS OF FACT[2]

### A.    The Parties

Assignors are sophisticated, experienced commercial real estate

professionals. Mr. Meyer first began his work in the field after graduating from

college. (Tr. 35:8–12.) He worked in Continental Real Estate's leasing and

---

[1] The Third-Party Complaint also joined Third-Party Defendants Clean Title, Inc. and Clean Title Agency, Inc. All claims against those parties were dismissed before trial. (ECF No. 31.)

[2] The labels and headings included in this Bench Opinion and Order of Final Judgment are not controlling. *See Cordovan Assoc., Inc. v. Dayton Rubber Co.*, 290 F.2d 858, 860 (6th Cir. 1961) (citing *Bogardus v. Comm'r of Internal Revenue*, 302 U.S. 34 (1937)). To the extent a finding of fact constitutes a conclusion of law, the Court adopts it as such, and vice versa.

development groups, and eventually became an equity partner in the company's projects. (*Id.*, 35:13–19.) Mr. Pottschmidt also worked for Continental Real Estate. (*Id.*, 362:25.) After ten years with Continental, Mr. Pottschmidt held the title of Vice President of Development and had also invested in several of the company's projects. (*Id.*, 363:2–7.) Mr. Brunt first met Mr. Meyer in 1995, when he was Senior Director of Real Estate for The Gap, working with the Continental team to bring Old Navy stores to Ohio. (*Id.*, 448:11–25.) Mr. Meyer and Mr. Pottschmidt left Continental in 2000 and co-founded Stanbery Development, LLC, a firm focused on developing open-air shopping centers. (*Id.*, 36:2–6.) That same year, Mr. Brunt left The Gap—his employer of twenty-one years—to work with Stanbery Development in commercial leasing. (*Id.*, 448:6–17, 449:2–6.)

Stanbery Development has completed fourteen projects, with three more currently in progress. (*Id.*, 38:16; 364:14–15.) Stanbery Development develops projects by investment with partners in special purpose entities (or SPEs). (*Id.*, 40:7–22.) Stanbery Development typically receives equity in the SPE and either a development fee or a special distribution fee, intended as compensation for overhead expenses incurred in project financing and development. (*Id.*, 39:1–40:14.) Although Stanbery Development receives all or some of that compensation before a project is complete, the gain is generally not taxable until the project is sold and the SPE disposes of its assets.[3] (*Id.*, 40:1–5.)

---

[3] The tax treatment of the transactions described herein is not currently in dispute, and the Court offers no finding or opinion on the propriety of the Stanbery Parties' determination of such tax treatment.

Between 2004 and 2007, Stanbery Development and four SPEs obtained more than $175 million in loans from various lenders for the development of projects titled The Shoppes at Wyomissing, The Shoppes at Hamilton, and The Promenade at Coconut Creek. (*See* Exs. J-1–J-60, recitals. *See also* ECF No. 113, 2.) The Bank (as successor to LaSalle Bank) was one of those lenders. (*See* Exs. D-1–D-4, preamble.) Assignors personally guaranteed the loans. (*See id*., preamble and recitals.)

After the 2008 economic downturn, the borrowers defaulted on the loans and Assignors defaulted on their guaranty obligations. (*See* Exs. D-1–D-6, recitals.) At the time of default, the loans' outstanding balance totaled $155 million. (*See* Exs. D-1–D-4, § 2; Exs. D-5–D-6, § 3.) Facing bankruptcy, Assignors requested that the lenders release them from their obligations under the loans. (Exs. D-1–D-6, recitals.) The lenders ultimately agreed in exchange for, *inter alia*, (i) proceeds from the sales of the Wyomissing, Hamilton, and Coconut Creek properties and (ii) a portion of any proceeds from the sales of four other Stanbery Development projects in which the Bank had no existing interest. (Exs. D-1–D-6.) The latter was accomplished by execution of sixty near-identical[4] Assignments of Proceeds (the "Assignments"). (*See* Exs. D-2–D-6, J-1–J-60.)

_____

[4] Each Assignor (Meyer, Pottschmidt, and Brunt) executed one Assignment per Property (Old Bridge, Harrisburg, Union Hill, and English Village) per borrower (Stanbery Development and the four SPEs). (*See* Exs., J-1–J-60.) The Assignments are identical except with respect to the party names, description of the underlying loan, and the Allocated Percentage. (*Id*.)

**B.    Assignments of Proceeds**

The Assignments apply to the following properties (each a "Property" and, collectively, the "Properties"):

- The Shoppes at Old Bridge ( "Old Bridge");

- The Shoppes at Susquehanna Marketplace ("Harrisburg");

- The Shoppes at Union Hill ("Union Hill"); and

- The Shoppes at English Village ("English Village"),

owned respectively by the following SPEs (each a "Company" and, collectively, the "Companies"):

- Stanbery Old Bridge LLC;

- Stanbery Harrisburg, LP;

- The Shoppes at Union Hill, LLC; and

- Stanbery English Village, LP.

(*Id.*)

Each dated September 30, 2010, the Assignments provide in relevant part as follows:

<u>Assignment of Allocated Percent of Sale Proceeds</u>

- The Assignor assigns to the Bank a certain percent (the "Allocated Percent") of the Sale Proceeds (defined below) resulting from any sale of the applicable Property. (Exs. J-1–J-60, § 1(a).)

  - o "Sale Proceeds" means (a) the cash and non-cash proceeds received by the Company and/or Assignor from a Sale (defined below), minus (b) any out-of-pocket costs incurred by the "Company directly in connection with such Sale, including (i) income or gains taxes actually payable by the Company or Assignor as a result of any gain recognized in connection with such Sale, without regard to losses, deductions or credits unrelated to such Sale which might otherwise

affect the actual taxes payable," (ii) payment of debt (including principal, interest, and any prepayment penalties) secured by the Property, and (iii) reasonable and customary transaction costs associated with the Sale. (*Id.*, § 1(a)(i).)

o "Sale" means "a sale, assignment, conveyance, transfer, merger or other disposition of or to, or any exchange of or by the Company or its assets or fractional interest therein with any person, in one transaction or a series of transactions outside the ordinary course of business, any event which results in a change of control of the Company, or any refinancing or restructuring of all or any portion of any debt of the Company." (*Id.*, § 1(a)(ii).)

<u>Notice and Documentation Related to a Sale</u>

- The Company and Assignor must provide the Bank at least thirty days' "advance written notice of the occurrence of any Sale[.]" (*Id.*, § 1(b).)

- The Company and Assignor must, at least ten days prior to any Sale, "(or as soon thereafter as the relevant calculations are available)", provide the Bank "documentation setting forth, in reasonable detail" the material facts of the Sale and the "Company's and Assignor's calculation of the Sale Proceeds resulting from such Sale[.]" (*Id.*)

<u>Escrow of Allocated Percent and Availability of Escrow Funds</u>

- Within three days of the Company's receipt of any Sale Proceeds, the Allocated Percent must be paid into escrow. (*Id.*, § 1(c)(ii).)

- The Escrow Funds (defined below) may be distributed only for payment of a Tax Balance (defined below) or upon written instruction from the Bank to the escrow agent "of either or that either (1) (a) a Qualifying Sale [(defined below)] or (b) a final determination of the Appraisal Amount[5] has occurred under this Assignment and each of the Other Assignments . . . , or (2) the ninth anniversary of the date of this Assignment has occurred[.]" (*Id.*, § 1(d)(iii)(B).)

---

[5] Pursuant to the Assignments, the Appraisal Amount is determined only if the Property has not experienced a Qualifying Sale before September 30, 2018. (*See* Exs. J-1–60, § 1(c)(iii).) It is undisputed that each of the Properties experienced a Qualifying Sale before that date. It is therefore unnecessary to include a detailed definition of the Appraisal Amount here.

o "Escrow Funds" means escrow amounts payable under each of the sixty Assignments, plus any interest, dividends, income, capital gains, and other amounts earned thereon. (*Id.*, § 1(d)(ii).)

o "Tax Balance" means the excess of any "income or gains taxes actually payable by the Company or Assignor as a result of any gain recognized in connection with [a] Sale" over "the cash proceeds payable to the Company or Assignor from such Sale without taking into consideration the Sale Proceeds payable to" escrow. (*Id.*, § 1(d)(iii)(A).)

o "Qualifying Sale" means "a Sale: (i) by the partners of the Company of all or substantially all of the partnership interests of the Company, (ii) in which the Company is a party and in which the partners of the Company before such Sale do not retain, directly or indirectly, at least a majority of the beneficial interest in the voting stock of the Company after such transaction, or (iii) by the Company of all or substantially all of the [l]and, the [i]mprovements, all easements, rights of way or use, privileges, or licenses and rights to the same belonging or appertaining to the [l]and, and all personal property located in or on the [l]and and/or the [i]mprovements and owned by the Company." (*Id.*, § 1(c)(iii)(B).)

Each Assignment further provides that its terms "may not be amended or modified except by a writing signed by each of the parties." (*Id.*, § 8(*l*).) Similarly, "[a]ll . . . waivers required or permitted to be given under this Assignment shall be in writing . . . ." (*Id.*, § 8(a).) But, "[n]o waiver of any breach or default under this Assignment shall be deemed to be a waiver of any subsequent breach or default." (*Id.*, § 8(h).) The parties further:

agree to take any and all additional actions, including, without limitation, the execution, acknowledgement and delivery of any and all documents which [any party] may reasonably request, in order to effect the intent and purposes of this Assignment and the transactions contemplated hereby.

(*Id.*, § 8(b).)

7

### C.   Sales and Qualifying Sales of the Properties

#### 1.   May 8, 2013: Union Hill Refinance

Union Hill was the first Property to experience a "Sale," as defined in the Assignments. (Tr. 52:3–4.) On March 20, 2013, the Stanbery Parties, through Stanbery Development's then-chief financial officer Matt McClimon, notified the Bank's representative, Michael Olson, via email that Union Hill would be refinanced. (Ex. P-28, SB00002210.) On May 7, Mr. McClimon advised Mr. Olson that the refinancing was scheduled to close the following day. (*Id.*, SB00002208.) On May 14, Mr. McClimon again emailed Mr. Olson, stating in part:

> Attached is both the closing statement and the loan payoff statement. . . .
>
> Also, for simplicity I have taking [sic] these statements to create a reconciliation as to my estimate of the amount that needs to be funded into escrow. We still have not received the borrowers [sic] legal fees. . but based on my discussions with [Stanbery Development counsel Gerry Swedlow] I have an educated estimate. This should be final later this week. . . .

(*Id.*, SB00002207.) After some additional correspondence, Mr. Olson advised that "[t]he escrow should be established if [the refinance] has closed. . . ." (*Id.*, SB00002204.) Mr. McClimon responded:

> Yes it did close on 5/8. As to setting up the escrow this has not been done as
>
> 1)   We still need final legal numbers. Gerry is working on this.
>
> 2)   I need your final "sign off" on my calculations.
>
> 3)   None of the "overborrowings" have been distributed to the partners until we can get these things resolved. . and to further protect the "spirit" of the deal.

8

(*Id.*) Mr. McClimon later sent "final" calculations to Mr. Olson. (*Id.*, SB00002203.) Mr. Olson noted in response that Mr. McClimon's Allocated Percent figures differed from his own by 0.01%. (*Id.*, SB00002202.) Mr. McClimon sent a reconciliation "to tie to [Mr. Olson's] numbers." (*Id.*) Mr. Olson then stated "I am ok with the reconciliation, as revised. Please let me know the details of the escrow." (*Id.*, SB00002201.)

An escrow agreement was executed on July 15, 2013, to hold the Allocated Percent of Sale Proceeds resulting from the May 8, 2013 refinance of Union Hill. (Ex. P-31.) A total of $85,670 was deposited into escrow, with Mr. Meyer contributing $30,149; Mr. Pottschmidt contributing $35,339; and Mr. Brunt contributing $20,182. (*Id.*)

### 2. December 13, 2013: English Village Refinance

English Village was also refinanced in 2013. (Tr. 58:8–11.) On September 30, 2013, Mr. Meyer emailed Mr. Olson, stating:

> We didn't sell English Village, though had it on the market for a while. We also had Harrisburg on the market, it didn't sell either. As you know, we did refinance Union Hill last spring. We hope to refinance English Village in the next 90-120 days, as the CMBS loan on it comes due.
>
> I would imagine that, by year end, you will need personal financials for Ray, Mark and myself. Additionally, you may need our tax returns? I haven't filed mine yet, I assume Ray and Mark are also going to file in October.
>
> So, perhaps we send you our financials and returns, if required, in late October/early November?

(Ex. P-34, SB00002116.) Mr. Olson responded that "[t]he financials in November will be fine." (*Id.*, SB00002215.)

On December 13, 2013, Mr. Meyer sent the following email to the Bank's new representative on the Stanbery matter (Mr. Olson's replacement), Sara Allen:

Sara

I hope you are doing well and staying warm!

Sorry for the brief delay in getting the following information to you. As discussed, we closed on our loan to refinance The Shoppes at English Village. In keeping with the terms of our agreement with [the Bank], we need to set up an escrow for a portion of the over borrowings, much as we did for the refinance on the Shoppes at Union Hill last spring.

Attached, for your review, are documents related to this loan closing and associated calculations for the escrows for Mark Pottschmidt, Ray Brunt, and me. After you have had the opportunity to review this information, please let us know if you have questions related to this matter. As soon as we come to agreement that our calculations are correct, we can each send the funds into the escrow account. I am not sure if we need an additional agreement and/or if we should send the funds to the same escrow account as was established after the loan closing last spring. Perhaps you, or our counsel, Gerry Swedlow (copied), can advise on that matter.

As you have recently taken over our 'account,' I want to point out that we were working on this refinancing last Spring. We, temporarily, halted the refinancing during the summer, as we marketed the property for sale. After we terminated our efforts to sell the asset, we went back to the same lender in order to finish the refinancing that we had started. Hence, some of the expenses came through on the closing statement, while others were paid for services rendered during the initial push to refinance. As Michael [Olson] may have mentioned, we are happy to share information. So, if you need additional paperwork, information, or just to chat, we're happy to do so, just let us know.

Attached:
-Closing Statement
-Loan Payoff Statement
-Reconciliation schedule to calculate over borrowing and escrow amounts.
-Refinance costs from Spring 2013

(Ex. P-36. *See also* Ex. D-126.) On January 16, 2014, Ms. Allen responded, stating in part, "Yes, I approve the calculations for the escrows for Mark Pottschmidt, Ray Brunt and yourself." (Ex. J-63.) The escrow agreement was executed on February 21, 2014. (Ex. D-129.) Pursuant to its terms, $46,429 in Sale Proceeds resulting from the English Village refinance were deposited into escrow, with Mr. Meyer contributing $11,039; Mr. Pottschmidt contributing $22,693; and Mr. Brunt contributing $12,697. (*Id.*)

### 3.    May 15, 2015: Old Bridge Deed in Lieu of Foreclosure

Before the Assignments were executed, all parties were aware that Old Bridge was worth less than the face value of its debt (*i.e.*, it was "underwater"), and so any transaction would *not* likely result in any Sale Proceeds and *would* likely result in significant tax liability for Assignors. (*See* Tr. 72:22–73:8; 77:6–7; 77:23–78:11.)

In September 2014, the Stanbery Parties became unable to service the Old Bridge debt and were put into default. (Tr. 258:8–17. *See also* Meyer Dep., 64:23–66:19, ECF No. 49.) On December 17, 2014, Mr. Swedlow explained the situation in an email to Ms. Allen with the subject line "Stanbery Old Bridge":

> Sara: The lender for the shopping center owned by Stanbery Old Bridge, LLC, has instituted a foreclosure action in New Jersey. A receiver has been appointed. I do not know the timing with respect to the foreclosure sale itself, but, I assume it would take place in 2015.
>
> Whether or not the foreclosure will actually occur is unknown at this time. There is always a possibility that we can work something out with the lender, but, so far, have not been able to do so.

> Please let me know if you have any questions or need additional information. If you need a more formal notice, as otherwise required under the Assignments of Proceeds, let me know.
>
> This notice is being sent on behalf of the Company (Stanbery Old Bridge, LLC) and the Assignors – Jon, Mark and Ray.
>
> Thank you – Gerry

(Ex. D-130.) Mr. Swedlow addressed Old Bridge again in an April 28, 2015 email to

Ms. Allen:

> [T]here will be a deed in lieu of foreclosure for Old Bridge. There is no reason to continue the fight since we really have no defense. As soon as this is accomplished – probably next week, we will get ou [sic] the applicable numbers although, again, the tax liability determination will take additional time.

(Ex. J-68.)

The deed in lieu of foreclosure was executed on May 15, 2015. (Ex. P-48.)

That day, Mr. Swedlow emailed Ms. Allen:

> Sara: Attached please find the tax calculation in connection with the deed in lieu transaction for Old Bridge. The "sales price" is somewhat of a fiction since it equals the loan balance. That's how our accountants tell us it must be reported since the loan is exculpatory. Nevertheless, as you can see, it produces a substantial tax – both federal and state – for Jon, Mark and Ray.
>
> I suggest that the tax deduction be used when we settle up in 2018, unless, of course, the centers are all sold before then.

(Ex. D-131.) Five charts were attached to the email, showing "[e]stimates as of

12/31/14" for the tax liability resulting from the deed in lieu at the Company and

Assignor levels. (*Id.*) The charts were prepared by the accounting firm of Krisiewicz,

McCoy & Company, at the direction of Assignors and in accordance with their

instructions. (*Id. See also* Tr. 81:20–24; Ex. D-153.) Because the deed in lieu

resulted in no proceeds for the Stanbery Parties, the Company-level chart is largely blank, save only for the "sale price" (loan balance), the total taxable gain attributable to each Assignor based on their interest in the Old Bridge project, and the resulting tax liability. (Ex. D-131.) According to the charts, Mr. Meyer's tax liability was estimated to be $2,639,838; Mr. Pottschmidt's, $678,768; and Mr. Brunt's, $614,627. (*Id.*) No supporting documents were provided to the Bank. (Tr. 171:9–172:3.)

On June 1, 2015, Mr. Meyer sent the following email to Ms. Allen:

Sara

As a follow up to our discussion last week, let me know if this answers your questions, as Gerry Swedlow, our counsel, and I spoke:

- Section 1a.II of the assignment of proceeds defines a sale as any …conveyance, transfer…or other disposition. Clearly a deed in Lieu is a 'sale.'

- From Gerry on the 'accounting:' The Assignment of Proceeds (Pledge), Section 1 (d), no payment to [the Bank] is to be made until either all of the properties have been sold or the 8 years have passed and then during the 9th year all of the net proceeds are added and then the tax liability subtracted. If there is a plus, it's paid to [the Bank] over a period of time if the appraisal applies – otherwise in cash if all has been sold. If taxes exceed proceeds, nothing is payable to [the Bank] and the Escrow Agent is to distribute back to the Assignors (Jon, Mark and Ray).

If this does not appropriately answer the questions I believe I heard, please let me know.

(Ex. J-69, SB00002294.) The deed in lieu was recorded on June 9, 2015. (Ex. P-48.)

The Bank has since been provided with two subsequent sets of calculations pertaining to the Old Bridge deed in lieu. The first came more than a year after the deed was recorded, on June 15, 2016. (Ex. J-74.) According to the June 15, 2016

calculations, Mr. Meyer's tax liability was $2,712,341 ($72,503 more than originally estimated); Mr. Pottschmidt's, $695,864 ($17,096 more than originally estimated); and Mr. Brunt's, $633,521 ($18,894 more than originally estimated). (*Id.*) The second came on February 21, 2017. (Exs. J-81, P-52.) For the first time, the calculations were marked as "Final per 12/31/15 Tax Return." (Ex. P-52.) According to the final calculations, Mr. Meyer's tax liability was $2,463,914 ($175,924 less than originally estimated); Mr. Pottschmidt's, $610,484 ($68,284 less than originally estimated); and Mr. Brunt's, $542,794 ($71,833 less than originally estimated). (*Id.*)

### 4. May 28, 2015: Harrisburg Sale

On April 29, 2015, the Bank was notified via email from Mr. Swedlow that Harrisburg was in contract to sell and that the closing would occur in either May or June. (Ex. J-68.) He further stated:

> The gross purchase price is $44,000,000 . . . . I don't know the amount of the present mortgage balance nor do I have an estimate of sales costs. In addition, it will take some time for Jon, Mark and Ray – each of whom have separate accountants to compute the tax liabilities, which, as you know, is a deduction in the computation.

(*Id.*) On June 10, Mr. Swedlow sent an email to Ms. Allen containing charts with calculations pertinent to the Harrisburg sale.[6] (Ex. P-50.) In the body of the email, Mr. Swedlow explained:

---

[6] Although Mr. Swedlow sent the email on June 10, 2015, he and the Stanbery Parties were then unaware that Ms. Allen was on a medical leave of absence due to an injury sustained the week prior. (*See* Tr. 698:12–699:20. *See also* Ex. J-71.) There is no dispute that Ms. Allen received the email on October 15, 2015, after she returned to work. (Ex. P-50.)

> Sara: Although final numbers won't be available until all expenses are known and escrows have been determined, the attached is very close to a "final." As we get more accurate and up to date numbers, we will revise the schedule and send it to you.

(*Id.*) The charts were stamped: "Estimates as of 05/28/2015." (*Id.*) The calculation methodology used in these charts began by subtracting the closing costs and debt pay-off from the $44 million purchase price to determine the "Net Sales Price."[7] (*Id.*, BA000012179.) Each Assignor's Allocated Percent was applied to the Net Sales Price to determine "Net Cash Flow Before Assignors Taxes." (*Id.*) The charts then set out each Assignor's total estimated gain from the sale, and estimated tax liability resulting therefrom. (*Id.*) The estimated tax liability was next deducted from the Net Cash Flow Before Assignors Taxes to determine a "Net Cash Flow." (*Id.*) The Net Cash Flow for each of the Assignors was negative. (*Id.*)

When she received Mr. Swedlow's email, Ms. Allen looked quickly at the attached charts. (Tr. 816:22.) Because they were "based on estimates," she did not review them in detail. (Tr. 817:11–13.) No supporting documents were provided to the Bank. (Tr. 182:14–183:8.) The Bank received updated calculations for the Harrisburg sale on June 15, 2016 (Ex. J-74), and "final"[8] calculations on February 21, 2017, and August 4, 2017 (Exs. J-81, P-52, D-143). No escrow account was

---

[7] The capitalized terms used in these charts do not appear in the Assignments.

[8] Although the February 21, 2017 and August 4, 2017 calculations are both marked "final," they differ as to Mr. Meyer's Allocated Percent. (*Compare* P-52, SB00000002 *and* D-143, BA000012188.)

established relative to this transaction, and no escrow agreement was drafted. (Tr. 106:16–17.)

### 5. March 30, 2016: Union Hill Sale

On March 9, 2016, Mr. Meyer provided noticed to the Bank that Union Hill was in contract to sell. (Ex. J-73.) His email to Ms. Allen stated, in part:

> Please accept this as notification that our property, The Shoppes at Union Hill, is in contract to sell. We anticipate the closing later this month.
>
> I have attached two documents. The first is a summary of the sale of Union Hill, the tax impact and the pledged amount. The second document is a summary, one for each of the guarantors, showing all projects that have transacted, in addition to Union Hill.
>
> As you can see, Mark Pottschmidt is the only individual who has a 'net positive,' after tax calculations, for Union Hill. Viewing the summary of the sale of the four assets, he still shows a substantially negative number, though, overall.
>
> Please let me know if you have any questions on this information. We will continue to keep you informed.

(*Id.*) Ms. Allen responded the following day, indicating should would review the information provided. (*Id.*)

Mr. Meyer's March 9 email included still more charts (again prepared by the Krisiewicz firm at the direction and in accordance with the instructions of Assignors), this time with calculations pertinent to the Union Hill sale. (Ex. P-53. *See also* Tr. 114:19–115:13.) As before, charts were provided at the Company- and Assignor-level. (*Id.*) The charts were dated March 8, 2016, and noted that the figures provided for closing costs and taxes were estimates. (*Id.*) Notably, on this occasion, the Assignor-level charts included columns for all four Properties and a

fifth column for a "Total." (*Id.*) In the Total column, the Assignor's tax liability for all transaction was aggregated, and then deducted from the "Total Pledge Amount" (referred to in previous charts as Net Cash Flow Before Assignors Taxes), resulting in a substantial negative number. (*Id.*)

Although the charts indicate that Union Hill sold for $63.5 million and that closing costs were estimated to exceed $2.5 million, no supporting documents were provided to the Bank. (Tr. 608:22–609:3.) The Bank received updated calculations for the Union Hill sale on June 15, 2016 (Ex. J-74), and on August 4, 2017 (Ex. D-143). No escrow account was established relative to this transaction, and no escrow agreement was drafted. (Tr. 123:5–6.)

### 6. August 4, 2017: English Village Sale

On August 4, 2017, Mr. Meyer emailed Ms. Allen with notice to the Bank that English Village was being sold. (Ex. D-143.) The email provides, in part:

> Please accept this email as notice that we are selling English Village, the final property involved in our settlement with [the Bank]. The estimated numbers are summarized in the attached file. As you can see, we don't believe that funds will need to be added to the existing escrow. As you know, the full accounting and tax numbers will not be completed for some time. That said, it is clear to me that, as each of us are at a substantially negative number overall, that tax revisions do not have a chance to raise us into an area within which we would owe funds.
>
> Specific to the sale of this property, while we've used the total sale price to drive the numbers, there are escrows of well over $1 mm which may end up reducing the sale proceeds. If there is a claim on these funds, the numbers would be adjusted into more negative territory, and the tax impact not fully be [sic] calculated until 2019.

(*Id.*) Attached to the email were more charts, in the same style as those sent to the Bank in 2016, with numbers reflecting the disposition of all four Properties and a

17

Total column. (*Id*.) In those charts, the Harrisburg and Old Bridge figures are marked as "Final." (*Id*.)

Although the charts indicate that English Village sold for $57 million, and that closing costs were estimated at $6.5 million, no supporting documents were provided to the Bank. (Tr. 608:22–609:3.) The Bank later learned that the English Village sale closed on August 4, 2017—the same day Mr. Meyer sent the above-quoted email. (*See* Tr. 721:20–21; Ex. D-78.) The Bank also later learned that the $1 million escrows referenced in Mr. Meyer's email were returned to Assignors. (*See* Tr. 838:25–829:19.) No escrow account was established relative to this transaction, and no escrow agreement was drafted. (*Id*., 386:15–16.)

### D.    The Parties Dispute Amounts Owed Under the Assignments

In the summer of 2016, it became clear that the parties were not in agreement on two material issues related to performance of the Assignments. First, the parties disagreed as to how Sale Proceeds should be calculated for a Sale that results in the Stanbery Parties incurring tax liability. Second, the parties disagreed as to whether all Sales should be aggregated or "cumulative"—with the practical implication being, whether the Old Bridge Tax Balance can be used to offset any amounts owed as a result of the subsequent Sales of Harrisburg, Union Hill, and English Village.

The dispute was discovered when Assignors' calculations were presented to the Bank in charts which include a "Total" column. Charts were first provided in such format as attachments to Mr. Meyer's March 9, 2016 email. (*See* Exs. J-73, P-

53.) Ms. Allen received a follow-up email from Mr. Meyer on June 15, 2016, with the subject line "Union Hill Sale." (Ex. J-74.) The email reads, in part:

> As a follow up to my March 9, 2016 email, note that we sold our Shoppes at Union Hill on March 30th. My apologies for taking this long to get you an update on the sale. Please see the attached updated calculations on the impact of the sale and tax calculations.

(*Id*.) The attached charts, titled "Bank of America Updated Cash Flow Analysis" and dated June 10, 2016, display Assignor- and Company-level calculations related to the Union Hill transaction. (*Id*.) The Assignor-level charts are in the format first used in March 2016, displaying columns for each of the four Properties, and a fifth column titled "Total." (*Id*.) Although Ms. Allen first received charts in this format three months prior, the charts attached to the June 15 email gave her pause and caused her to question whether they accurately reflected the Assignments' terms. (Tr. 711:14, 712:18–21.) Two days later, Ms. Allen engaged counsel to assist on that question. (Tr. 694:23–24.)

> On September 12, 2016, Ms. Allen sent the following email to Mr. Meyer:

> Hi Jon,

> Hope all is well. We had a change of outside counsel for Stanbery and I asked her to review the documentation. You mentioned that the settlement was cumulative across all entities but our review of the documents does not show that. Can you show me where in the documentation it refers to this? Also, can you send me a list of the assets left to be refinanced/sold so I can compare them to my list. Look forward to hearing from you.

> Thanks,

> Sara

19

(Ex. J-76.) Mr. Meyer responded quickly, indicating he would direct Mr. Swedlow to "look at the documents and direct us on this." (*Id.*)

Mr. Swedlow completed his review and sent an email to the Bank's new counsel, the firm of Miller Canfield, on October 24, 2016. (Ex. J-78, BA000017579.) That email reads, in part:

> I have reviewed the Assignments of Proceeds with respect to the issue of whether or not the numbers for the four centers are to be combined or treated separately. As you know, we believe that the results of Old Bridge, Harrisburg, Union Hill and English Village are to be combined for each of the four [sic] Assignors so that, for example, the interest of Jon Meyer in the four centers ends up as one number.

(*Id.*) Two days later, Ms. Allen emailed Mr. Meyer:

> Hi Jon,
>
> I have a list of items that we need to verify the calculations you have previously sent. Please send them via email when you have them available. Let me know if you have any questions or comments.
>
> - Property 1: Shoppes at Union Hill
>   - Closing Statement from 2013 refinance + 2013 tax returns for guarantors + calculations used to determine escrow amounts.
>   - Closing Statement from 2015 sale + 2015 tax returns for guarantors (once they have been filed)
> - Property 2: Harrisburg
>   - Closing Statement from sale + tax returns for guarantors
> - Property 3: Old Bridge
>   - Deed-in-lieu documentation + tax returns for guarantors
> - Shoppes at English Village
>   - Closing Statement from 2014 refinance + 2014 tax returns for guarantors + calculations used to determine escrow amounts.

(*Id.*, BA000017577.) Mr. Meyer responded within five minutes: "Thanks. As discussed, I'll hold this list until I hear further from you." (*Id.*)

The working relationship between Assignors and the Bank then collapsed. In November 2016, Ms. Allen instructed Mr. Meyer to direct all correspondence to Miller Canfield. (Ex. J-79.) Miller Canfield also sent a letter to Assignors, stating:

> There are a number of documents that [the Bank] seeks under the terms of the [Assignments] to support the material facts of each of the events constituting a Sale under the [Assignments] and Assignors' proposed calculation of the Sale Proceeds resulting from each such Sale as set forth in Assignors' "Bank of America Updated Cash Flow Analysis" dated as of June 10, 2016.

(Ex. D-90, SB00014322.) The letter requested specific documents, including those listed in Ms. Allen's email, plus loan payoff statements, Company tax returns, and documents bearing on the value of English Village (which had not yet been sold). (*Id.*, SB00014322–23.) Through their counsel, the firm of Zeiger Tigges & Little, Assignors responded to Miller Canfield's letter on December 16, 2016, with closing statements from the 2015 Harrisburg sale and the 2016 Union Hill sale. (Ex. D-92.) Two months later, on February 21, 2017, Zeiger Tigges & Little sent roughly 250 more pages of documents (Ex. J-81) and, on October 4, 2017, another 1,500 (Ex. P-60).

Several notable events took place while documents were being compiled for production. First, throughout the summer of 2017, the parties attempted to coordinate a meeting to discuss the dispute that had arisen. (*See* Exs. J-82, D-98.) That meeting never took place. (*See* Ex. J-84.) Second, English Village was sold, causing Mr. Meyer to send the August 4, 2017 email and calculations to Ms. Allen. (*See* Ex. D-143.) And, third, Miller Canfield, on behalf of the Bank, sent a formal

Notice of Default, Request for Documents and Demand for Further Assurances (the "August 30 Default Notice") to Assignors on August 30, 2017. (Ex. J-83.)

The August 30 Default Notice alleged that the Stanbery Parties were in default of the Assignments for failing to escrow the Allocated Percent of Sale Proceeds resulting from the sales of Harrisburg and Union Hill, and for failing to provide timely notice of those sales. (*Id*.) The August 30 Default Notice indicates that the Bank was unaware that the English Village sale had closed earlier that month, and requests pertinent substantiating documents "not less than one [] business day before closing[.]" (*Id*., SB00014240.)

Following further production of documents (*see* Ex. J-60), Miller Canfield sent a Notice of Default and Opportunity to Cure, dated October 24, 2017 (the "October 24 Default Notice"), alleging that the Stanbery Parties were in breach of the Assignments pertaining to English Village. (Ex. J-88.) The October 24 Default Notice also includes the Bank's calculation of Sale Proceeds due as a result of the English Village sale. (*Id*., BA000013177.) The Bank hired the public accounting firm Doeren Mayhew to assist in developing the calculation, based on the Assignments and supporting documents then in their possession. (*Id*., BA000013175–80.) Doeren Mayhew provided additional calculations of amounts due under the Harrisburg and Union Hill Assignments in a letter that Miller Canfield sent on behalf of the Bank on November 16, 2017. (Ex. D-114.)

The Bank's calculations differ drastically from Assignors', principally in their treatment of tax liability resulting from a Sale. The Bank deducts taxes from the

sale price before Sale Proceeds are determined (we might think of this as "above the line") and, therefore, before the Allocated Percent is applied. Assignors deduct taxes only after the Allocated Percent of Sale Proceeds has been determined ("below the line"), effectively negating any amounts that might be payable to escrow. Further, the Bank deducts all taxes payable by the Company, Assignors, and any other investors in the Company. Assignors deduct only the taxes payable by the individual Assignor. The difference is illustrated in the chart below:

| Bank's Calculations – Harrisburg Doeren Mayhew (Ex. D-114, BA000013155) | | Assignors' Calculations – Harrisburg Krisiewicz, McCoy & Company (Ex. D-143, BA000012188–90) | |
|---|---|---|---|
| Price | $ 44,000,000 | Price | $44,000,000 |
| Minus | | Minus | |
| Out-of-Pocket Costs | | Out-of-Pocket Costs | |
| Transaction Costs | $ 1,107,313 | Transaction Costs | $ 1,107,313 |
| Indebtedness | $ 26,902,411 | Indebtedness | $ 26,902,411 |
| Taxes | $ 6,388,447 | | |
| (Total Costs) | $ 34,398,171 | (Total Costs) | $ 28,009,724 |
| Equals | | Equals | |
| Sale Proceeds | $ 9,601,829 | Sale Proceeds | $ 15,990,276 |
| Multiplied by | | Multiplied by | |
| Allocated Percent | | Allocated Percent | |
| Meyer (2.34%) | $ 224,683 | Meyer (2.34%) | $ 375,771 |
| Pottschmidt (5.16%) | $ 495,454 | Pottschmidt (5.16%) | $ 825,098 |
| Brunt (2.63%) | $ 252,528 | Brunt (2.63%) | $ 420,544 |
| **Total Amount Due** | **$ 972,665** | | |
| | | Minus | |
| | | Taxes | |
| | | Meyer | ($ 988,116) |
| | | Pottschmidt | ($ 1,021,769) |
| | | Brunt | ($ 702,271) |
| | | Equals | |
| | | Amounts Due | |
| | | Meyer | ($ 612,345) |
| | | Pottschmidt | ($ 196,671) |
| | | Brunt | ($ 281,727) |
| | | **Total Amount Due** | **$ 0** |

## E.    Assignors' Other Conduct and Activities

Assignors each testified that they took actions or made investments they would not have, had they known that the Bank disputed their calculations.

At some point in May 2015, Mr. Meyer, Mr. Pottschmidt, and financial partners purchased the Old Bridge note from the lender. Mr. Meyer contributed $1

24

million to the repurchase and, Mr. Pottschmidt, $100,000. (Tr. 78:15–79:14, 153:19–20, 377:19.) In 2015 and 2016, Mr. Meyer also invested nearly $2 million into a Stanbery Development project in Parsippany, New Jersey. (*Id.*, 265:14–19.) Mr. Pottschmidt invested $225,000 into the Parsippany project. (*Id.*, 391:15–16.) Mr. Pottschmidt has also invested nearly $1 million into four World of Beer franchise locations since 2011. (*Id.*, 363:25–364:11, 391:6.)

Mr. Brunt decided to retire in 2014. (Tr. 486:10–11.) He finished work on pending Stanbery Development projects and fully retired in 2015, at some point after Harrisburg sold. (*Id.*, 486:12–15, 488:19–23.) In May 2017, Mr. Brunt purchased an apartment in New York City for $1.3 million. (*Id.*, 552:7–16.)

Finally, Assignors testified that they would have filed for bankruptcy protection in 2010 rather than enter into the Assignments, had they understood that the Bank would not accept the calculation methodology used in their charts. (*Id.*, 101:8, 390:24–25, 452:8–17.)

## II.    ORDER ON SUMMARY JUDGMENT

The parties now dispute the amounts (if any) owed under the Assignments, and whether the Bank has retained its right to collect. Before answering those questions, the Court finds it appropriate to review its Order on the parties' motions for summary judgment.

Assignors' Complaint seeks declaratory judgment as to the following: that the Assignors have correctly calculated the Sale Proceeds for English Village; that the Assignors are not required to put any additional funds into escrow; and that all amounts in escrow be returned to the Assignors. (Compl., 9, ECF No. 11.) The

Complaint also requests declaratory judgment that: the Bank has waived its right to challenge the Assignors' Sale Proceeds calculations as to Old Bridge, Harrisburg, and Union Hill, either intentionally or by estoppel; that the Bank ratified the Old Bridge, Harrisburg, and Union Hill calculations; and that laches bars the Bank from challenging these calculations. (*Id.*, 9–12.) The Bank responded with breach of contract and fraudulent transfer counterclaims against the Stanbery Parties regarding the sales of English Village, Harrisburg, and Union Hill. (Countercl., 10–28, 32–41.)

On April 26, 2019, the Stanbery Parties and the Bank each filed Motions for Summary Judgment. (ECF Nos. 59, 60.) On December 2, 2019, this Court ruled on the cross-motions, granting and denying each in part. (December 2 Order.) The December 2 Order established as a matter of law that "the Assignments are not ambiguous." (*Id.*, 7.) It further established the following, pursuant to the unambiguous terms of the Assignments:

- "[T]axes are deducted from proceeds [(not from Sale Proceeds)] *on a per-transaction basis*" and *before* application of the Allocated Percent (*Id.*, 9) (emphasis added); and

- Assignors are entitled to the Escrow Funds available as of the date of the Old Bridge sale—and *only* those funds—to compensate for the Tax Balance attributable to the Old Bridge sale (*Id.*, 23).

The Court found a genuine issue of material fact existed as to whether the Bank had waived intentionally or by estoppel, or was barred by laches from asserting, its right to challenge Assignors' calculations of Sale Proceeds on Union Hill and Harrisburg. (*Id.*, 26–27.) Nonetheless, summary judgment was warranted in that:

26

- The Bank did not ratify Assignors' calculations of Sale Proceeds (*Id.*, 26);

- As to Union Hill and Harrisburg, Assignors' breaches of Assignment § 1(b) were immaterial (*Id.*, 30–31);

- Barring a finding of waiver or laches at trial, Assignors are obligated to escrow the Allocated Percent of Sale Proceeds resulting from Union Hill and Harrisburg (*Id.*, 24);

- The Bank is not barred by waiver or laches from challenging Assignors' calculations of Sale Proceeds resulting from English Village, and Assignors are obligated to escrow the Allocated Percent of Sale Proceeds resulting therefrom (*Id.*, 32); and

- Assignors did not violate the Ohio Uniform Fraudulent Transfers Act (*Id.*, 36–37).

All remaining issues and claims were reserved for trial. (*See id.*, 37–38.)

## III.   CONCLUSIONS OF LAW

The Court first affirms the conclusions of law set out in the December 2 Order, summarized above. Accordingly, Assignors are entitled to the Escrow Funds available as of the date of the Old Bridge deed in lieu (which are, the monies placed in escrow following the Union Hill and English Village refinancings). Further, the Bank's method of calculating amounts due under the Assignments is the correct one. And, barring a finding that the Bank relinquished its right to enforce the Assignments, Assignors owe the Allocated Percent of Sale Proceeds from Harrisburg, Union Hill, and English Village to the Bank.

Assignors argue, on several theories, that the Bank has relinquished its right to monies owed under the Assignments—specifically, that: (i) the Bank breached its duty of good faith and fair dealing, such that Assignors are released from any obligation under the Assignments; (ii) the Bank intentionally waived its right to

27

challenge Assignors' calculations; (iii) the Bank waived by estoppel its right to challenge Assignors' calculations; and (iv) the Bank is barred by laches from challenging Assignors' calculations. Assignors' arguments are unavailing.

### A. The Bank did not breach its duty of good faith and fair dealing.

Under Ohio law[9], claims for breach of the implied duty of good faith and fair dealing are viable only if born from a breach of the underlying contract. The Ohio Supreme Court recently offered this detailed explanation:

> A cause of action for breach of contract requires the claimant to establish the existence of a contract, the failure without legal excuse of the other party to perform when performance is due, and damages or loss resulting from the breach. . . .
>
> In addition to a contract's express terms, every contract imposes an implied duty of good faith and fair dealing in its performance and enforcement. *See Ed Schory & Sons, Inc. v. Soc. Nat'l Bank*, 75 Ohio St.3d 433, 443, 662 N.E.2d 1074 (1996); Restatement of the Law 2d, Contracts, Section 205 (1981); *see also* R.C. 1301.304. We have recognized that "'"[g]ood faith" is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties.'" *Ed Schory & Sons* at 443–444, 662 N.E.2d 1074, quoting *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357 (7th Cir. 1990).
>
> As a comment in the Restatement explains, "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common

---

[9] Federal courts sitting in diversity apply state substantive law. *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). The forum state's choice-of-law rules determine which state's substantive law will apply. *Miller v. State Farm Mut. Auto. Ins. Co.*, 87 F.3d 822, 824 (6th Cir. 1996). However, "'[w]here neither party argues that the forum state's choice-of-law rules require the court to apply the substantive law of another state, the court should apply the forum state's substantive law.'" *Wilkes Assocs. v. Hollander Indus. Corp.*, 144 F. Supp. 2d 944, 949 n.4 (S.D. Ohio 2001) (quoting *ECHO, Inc. v. Whitson Co., Inc.*, 52 F.3d 702, 707 (7th Cir. 1995)). Here, the Assignments provide that they will be governed by Ohio law (*see* Exs. J-1–60, § 8(d)), which all parties consistently rely upon in their briefing. Consequently, the Court applies the substantive law of Ohio.

purpose and consistency with the justified expectations of the other party." Restatement, Section 205, Comment a. However, we have rejected the contention that a party breaches the implied duty of good faith and fair dealing merely by seeking to enforce the contract or by acting as permitted by its express terms. *Ed Schory & Sons* at 443–444, 662 N.E.2d 1074; *see also Wendy's Int'l, Inc. v. Saverin*, 337 F. App'x 471, 477 (6th Cir. 2009) (applying Ohio law); 23 Lord, Williston on Contracts, Section 63:22 (4th Ed. 2003). Thus, there is no violation of the implied duty unless there is a breach of a specific obligation imposed by the contract, such as one that permits a party to exercise discretion in performing a contractual duty or in rejecting the other party's performance. *See Ed Schory & Sons* at 443–444, 662 N.E.2d 1074; 23 Lord, Section 63:22; Restatement, Section 205, comment e.

Courts in Ohio have therefore recognized that there is no independent cause of action for breach of the implied duty of good faith and fair dealing apart from a breach of the underlying contract. . . .

*Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 469 (Ohio 2018) (internal quotation corrected). The Stanbery Parties have neither alleged, argued, or proved that the Bank breached "a specific obligation imposed by" the Assignments. On this basis alone, their argument fails.

Nonetheless, the Stanbery Parties *zealously* argue that the Bank has not operated in good faith and they are, consequently, absolved of their obligations under the Assignments. In particular, the Stanbery Parties allege that the Bank violated its purported duties to immediately notify the parties of its disagreement with the calculations, and to investigate the provenance of Assignors' mistaken methodology.

### 1. The Bank did not violate any duty to immediately notify.

In a multi-point argument, the Stanbery Parties assert that the Bank had a duty to notify them immediately upon receipt of any calculations made using the

erroneous methodology that the Bank would not accept such methodology. On each point, and in view of the evidence, the Court disagrees.

The Stanbery Parties first assert that they provided "All Required Notices and Calculations." (ECF No. 126, 12.) As to the required notices, it has already been decided as a matter of law that the undeniably untimely notices of sale were breaches of the Assignments, albeit immaterial ones. (*See* December 2 Order, 30.) As to the calculations, the Stanbery Parties produced several drafts of "estimated" Sale Proceeds calculations for the four Properties, and purportedly "final" calculations only as to three. The Stanbery Parties argue that the Assignments required no more of them; that they were required to provide only one "relevant" calculation and it was not necessary that the calculation be final. (*See* ECF No. 126, 13; Tr. 260:7–9.) This argument defies common sense—and itself raises a specter of bad faith. Estimated calculations become *ir*relevant in the face of a final. What's more, the Stanbery Parties' pre-litigation conduct indicates that they did not understand the Assignments in that way. The Stanbery Parties repeatedly implied an intent to provide updated calculations as components of the Sale Proceeds became known (*see e.g.*, Ex. J-68 ("As we get more accurate and up to date numbers, we will revise the schedule and sent it to you.")), and in fact provided no fewer than six sets of calculations—many revising figures used in previous drafts (Exs. D-131 (May 15, 2015 calculations), P-50 (June 10, 2015 calculations), P-53 (March 9, 2016 calculations), J-74 (June 15, 2016 calculations), P-52 (February 21, 2017

calculations), D-143 (August 4, 2017 calculations)). Although some revisions moved in favor of the Stanbery Parties, others moved in favor of the Bank.

The notion that the Stanbery Parties were not required to provide final calculations is also not supported by the Assignments, when read as a whole. It derives from an awkward interpretation of Section 1(b), which requires the Stanbery Parties to provide "as soon [after a Sale] as the relevant calculations are available" their "calculation of the Sale Proceeds resulting from such Sale." (Exs. J-1–60, § 1(b).) However, the parties to the Assignments also agreed "to take any and all additional actions, including, without limitation, the . . . delivery of any and all documents which [another party] may reasonably request, in order to effect the intent and purposes of this Assignment and the transactions contemplated hereby." (*Id.*, § 8(b).) The Bank is reasonable and fully within its rights under the Assignments to request—and, to *expect*—final calculations, along with any and all supporting documentation in their final and accurate forms. And the Stanbery Parties are compelled to provide them.[10]

The Stanbery Parties next argue that their calculation methodology is "Consistent With The Parties' Course of Conduct." (ECF No. 126, 13.) Much of this argument leans on evidence of the parties' statements and alleged intentions during negotiation of the Assignments, principally as to how tax liability would be accounted for in the computation of Sale Proceeds. The Court has already found the Assignments to be unambiguous as a matter of law, and declines the Stanbery

---

[10] This includes a final and accurate closing statement for English Village.

Parties' apparent invitation to consider the possibility that the parties meant what they did not say in the Assignments. (*See* December 2 Order (citing *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008)).) The Stanbery Parties also argue that the June 1, 2015 email from Mr. Meyer to Ms. Allen put the Bank on notice of its position and somehow established a course of conduct. In that email, Mr. Meyer explained his belief that:

> no payment to [the Bank] is to be made until either all of the properties have been sold or the 8 years have passed and then during the 9th year all of the net proceeds are added and then the tax liability subtracted. If there is a plus, it's paid to [the Bank] over a period of time if the appraisal applies—otherwise in cash if all has been sold. If taxes exceed proceeds, nothing is payable to [the Bank] and the Escrow Agent is to distribute back to the Assignors (Jon, Mark and Ray).

(Ex. J-69.) Although the Stanbery Parties assert that they "could not have been more clear[,]" that is simply not the case. For example, the above-quoted statement (i) is silent as to when the Allocated Percent is applied, (ii) is not clear on whether 'net proceeds minus tax liability' applies on a per-transaction basis or cumulatively, (iii) does not specify whether 'net proceeds minus tax liability' refers to the computation of Sale Proceeds or otherwise, and (iv) is not clear on whether the Tax Balance offset includes Escrow Funds attributable to subsequent Sales.[11] In other words, the statement is sufficiently vague that it *could* be read as entirely consistent with the plain and unambiguous language of the Assignments. It therefore gave the Bank no cause for concern.

---

[11] All of these disputes have been decided as a matter of law, based on the unambiguous language of the Assignments. (*See* December 2 Order.)

The Stanbery Parties sum up their argument on the supposed duty to immediately notify by noting that (a) the Bank's witnesses characterized the Stanbery Parties' calculations as "visibly erroneous," (b) the Bank would have reviewed the calculations as they came in and Ms. Allen testified that that was indeed her practice, and (c) the Bank did not request any additional information until the summer of 2016 despite offers by the Stanbery Parties. The argument is not persuasive. None of the cases cited by the Stanbery Parties support the imposition of a duty to immediately notify them of the Bank's potential disagreement with the Assignors' calculation methodology. Further, nothing in the evidence indicates that the Bank was acting in bad faith or unreasonably in raising questions about and objecting to the Assignors' calculations when and how it did. (*See* III.B., *infra*.)

### 2. The Bank did not violate any duty to investigate.

In a similar vein, the Stanbery Parties argue that the Bank had a duty to investigate once it received Assignors' calculations. According to the Stanbery Parties, "[a] duty to inquire or investigate arises where information has been provided (here the calculations) that should lead the other party to investigate." (ECF No. 126, 28.) The Stanbery Parties provide no citation to Ohio law supporting the imposition of such a duty. They do cite several out-of-state cases—none of which sets out controlling law, and all of which are easily distinguished on the facts. *See Mooring Capital Fund, LLC v. Phoenix Cent., Inc.*, No. CIV-06-0006-HE, 2007 WL 2292462 (W.D. Okla. Aug. 7, 2007) (leaving open the possibility that Oklahoma's "common law duty to perform [under a contract] with care, skill, reasonable

33

expediency and faithfulness" could be violated by lender failing to investigate after borrower notifies it that statement balance was incorrect); *Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 172 F. Supp. 3d 700 (S.D.N.Y. 2016) (applying New York law in suit by investors against trustee for breach of fiduciary duty, breach of contract, and negligence in which the court dismissed investors' breach of the implied duty of good faith and fair dealing claim as duplicative of the breach of contract claim); *Hausfeld v. Cohen Milstein Sellers & Toll, PLLC*, No. 06-CV-826, 2009 WL 4798155 (E.D. Pa. Nov. 30, 2009) (applying District of Columbia law to find violation of the duty of good faith and fair dealing when Operating Agreement required one party to "promptly furnish" capital account balance calculations following corporate break-up, but calculations were not provided for more than two months despite the parties participating in a court-facilitated settlement conference in the interim, at which the court requested the calculations and the offending party had drafts in his possession but did not produce them); *Schuetta v. Aurora Nat'l Life Assurance Co.*, No. 13-CV-1007-JPS, 2013 WL 6199248 (E.D. Wisc. Nov. 27, 2013) (applying Wisconsin law to deny motion to dismiss duty of good faith and fair dealing claim in suit against annuity issuer by lay annuitant, whom defendant knew to be unaware of his right to annuity benefit, for failing to correct his expressed mistaken impression and alert him to procedural requirements to obtain such benefit). The argument therefore fails.

**B.      The Bank has not lost its right to challenge Assignors' Sale Proceeds calculations.**

Having dispatched with the idea that the Bank breached the implied duty of good faith and fair dealing, the Court next turns to the Stanbery Parties' argument that the Bank relinquished its right to challenge Assignors' Sale Proceeds calculations. The Stanbery Parties invoke the doctrines of intentional waiver, waiver by estoppel, and laches. Upon review of the evidence, the Court finds that the Bank has not waived its right to challenge Assignors' Sale Proceeds calculations, nor is it barred by laches from doing so.

**1.      The Bank did not waive any right under the Assignments.**

Ohio law on waiver of contractual provisions is well-established. The Ohio Supreme Court explained, nearly a century ago:

> A waiver is a voluntary relinquishment of a known right. It may be made by express words or by conduct which renders impossible a performance by the other party, or which seems to dispense with complete performance at a time when the obligor might fully perform. Mere silence will not amount to waiver where one is not bound to speak.

*White Co. v. Canton Transp. Co.*, 2 N.E.2d 501, 505 (Ohio 1936) (quoting *List & Son Co. v. Chase*, 88 N.E. 120, 122 (Ohio 1909)). "The essential elements of a waiver are an existing right, benefit, or advantage; knowledge, actual or constructive, of the existence of such right, benefit, or advantage; and an actual intention to relinquish it or an adequate substitute for such intention." *Weaver v. Weaver*, 522 N.E.2d 574, 576 (Ohio 1987) (quotation omitted). The party asserting waiver bears the burden of proof. *White Co.*, 2 N.E.2d at 504. Waiver must be shown by "a clear, unequivocal, decisive act of the" waiving party. *Id.* at 505.

### a.    No intentional waiver

The Stanbery Parties first argue that the Bank's purported silence after receipt of Assignors' calculations operates as an intentional waiver of its ability to challenge the methodology used in those calculations. However, as discussed in III.A.1., *supra*, the Bank had no duty to speak. The Bank's silence cannot, therefore, establish an intentional waiver. *See White Co.*, 2 N.E.2d at 505. The Stanbery Parties point to no other evidence—let alone clear and unequivocal evidence—that the Bank had the actual intention to waive any right under the Assignments. The Court therefore finds that the Bank did not intentionally waive any such right.

### b.    No waiver by estoppel

The Stanbery Parties next argue that the Bank's same purported silence operates as a waiver by estoppel, precluding it from challenging Assignors' calculations. "Waiver by estoppel allows a party's inconsistent conduct, rather than a party's intent, to establish a waiver of rights." *PHH Mortg. Corp. v. Ramsey*, 17 N.E.3d 629, 634 (Ohio Ct. App. 2014) (internal quotations and citations omitted). Waiver by estoppel exists when "the acts and conduct of a party are inconsistent with an intent to claim a right, and have been such as to mislead the other party to his prejudice and thereby estop" the waiving party from insisting upon claiming such right. *Id.* (internal quotations and citations omitted). The doctrine "prevents the would-be wronged party from first acting as if he accepts the flawed performance long enough for the other party to rely on that and continue delivering under the contract and then later claiming the contract was breached and damages

are owed." *Ragen v. Hancor, Inc.*, 920 F. Supp. 2d 810, 818 (N.D. Ohio 2013). In the Stanbery Parties' view, the Bank acted as if it accepted Assignors' incorrect calculations long enough that they (the Stanbery Parties) relied on such acceptance and continued to perform under the Assignments, only to later face the Bank's Notices of Default. The Court disagrees with this characterization of events.

The Union Hill and English Village refinance transactions did not result in tax liability for any of the Stanbery Parties. That fact is significant for two reasons: First, the Sale Proceeds were calculable without having to wait months (or, even, years) for tax returns to be filed. And, second, there was no disagreement as to the method for calculating Sale Proceeds. Following these transactions, the Stanbery Parties submitted Sale Proceeds calculations and supporting documentation to the Bank, and both sought and received the Bank's approval of the resulting amounts due to escrow.

The next Sale was the Old Bridge deed in lieu. As was expected, the deed in lieu resulted in a Tax Balance. However, the Stanbery Parties received no cash or non-cash proceeds in exchange for Old Bridge. As a result, the charts—which would, in subsequent Sales, display the erroneous calculation methodology—gave the Bank no cause for concern.

Later that month, the Stanbery Parties sold Harrisburg for $44 million. This was the first Sale for which the Stanbery Parties' erroneous calculations mattered. Although a chart containing estimated calculations was sent on June 10, 2015, the

Bank did not receive it until October 15, 2015, due to Ms. Allen's medical leave.[12] The chart, in this instance, does display the erroneous calculation methodology. However, Ms. Allen testified that she did not review the charts in detail and so did not recognize the error. Ms. Allen's decision not to review the charts in detail was entirely reasonable. Mr. Swedlow had told her that the calculations were based on estimates, and would be updated in time. The Stanbery Parties provided no supporting documents, against which Ms. Allen could cross-check any known Sale Proceeds components (*e.g.*, sale price, debt pay-off, closing costs, etc.). Further, throughout the course of their discussions, the Stanbery Parties regularly referenced a reconciliation process after all of the Properties had transacted. The Stanbery Parties cannot now allege that Ms. Allen's reasonable response to their own conduct was inconsistent with the Bank's intent to claim the benefit of its bargain, or could in any way mislead the Stanbery Parties to their prejudice.

Union Hill was then sold for $63 million. Ms. Allen received charts related to this transaction on March 9, 2016, with estimated Sale Proceeds calculations and "Totals", aggregating the erroneous calculations for Old Bridge, Harrisburg, and Union Hill. Ms. Allen again had good reason to defer a detailed review; the sale of Union Hill was not expected to close for several more weeks. However, within two days of receiving updated calculations after closing, the Bank engaged counsel to advise on the Stanbery matter. That September, the Bank asked Assignors to identify the source of their calculation methodology and provide supporting

---

[12] Despite the Stanbery Parties' vocal protests, the delay owing to Ms. Allen's medical leave is immaterial.

38

documents. And that November, the Stanbery Parties were officially put on notice that the Bank disputed their calculation methodology.

The evidence does not establish a single element of waiver by estoppel. The Bank's acts and conduct were not inconsistent with an intent to claim its right to the Allocated Percent of Sale Proceeds, calculated in accordance with the unambiguous language of the Assignments. Nor were there any acts or conduct on the part of the Bank that would mislead Assignors as to its intent to claim that right. It is now clear, the Stanbery Parties were sorely mistaken as to the substance of the Assignments as written and executed. [13] And, perhaps, they made decisions they would not have, had they properly understood what the Assignments required of them. However, it is also clear, their mistake was in no way attributable to the Bank's purported acceptance of flawed performance under the Assignments. The Bank has therefore not waived by estoppel its rights under the Assignments.

### 2. The Bank is not barred by laches from asserting its rights under the Assignments.

Finally, the Stanbery Parties argue that the Bank is barred by laches from asserting its rights under the Assignments. Laches is defined as

> "an omission to assert a right for an unreasonable and unexplained length of time, under circumstances prejudicial to the adverse party." *Connin v. Bailey*, 15 Ohio St.3d 34, 35, 472 N.E.2d 328 (1984) quoting *Smith v. Smith*, 107 Ohio App. 440, 443, 146 N.E.2d 454 (1957), *aff'd*, 168 Ohio St. 447, 156 N.E.2d 113 (1959). To successfully invoke the doctrine the party invoking it must establish by a preponderance of the

---

[13] Although equitable remedies such as reformation or rescission may be available in the event of unilateral mistake (*see, e.g., Leach v. Leach*, 80 N.E.3d 1044, 1051 (Ohio Ct. App. 2016); *In re Duong*, 451 B.R. 800, 806–07 (N.D. Ohio 2011)), the parties to this action have neither requested nor argued in favor of any such relief.

evidence the following four elements: (1) unreasonable delay or lapse of time in asserting a right; (2) absence of an excuse for the delay; (3) knowledge, actual or constructive, of the injury or wrong; and (4) prejudice to the other party. *State ex rel. Meyers v. Columbus*, 71 Ohio St.3d 603, 605, 646 N.E.2d 173 (1995). Delay in asserting a right does not, without more, establish laches. Rather, the person invoking the doctrine must show that the delay caused material prejudice. *Connin*, 15 Ohio St.3d at 35–36, 472 N.E.2d 328; *Smith*, paragraph three of the syllabus. . . .

*Sims v. Anderson*, 38 N.E.3d 1123, 1130 (Ohio Ct. App 2015). For the reasons discussed above, the Bank's delay in asserting its rights under the Assignments was neither unreasonable nor unexcused.[14] The Bank is therefore not barred by laches from making a claim for the Allocated Percent of Sale Proceeds, calculated in accordance with the unambiguous terms of the Assignments.

### C.    Calculation of Damages

The calculations performed by the Bank's expert witness, Bruce Knapp of Doeren Mayhew, accurately reflect the amount of damages resulting from the Stanbery Parties' breach of the Assignments. Despite the Stanbery Parties' assertions to the contrary, the Court is persuaded that any gain from special distribution fees and all tax liabilities are accurately accounted for within those calculations.

---

[14] The Stanbery Parties make much of draft calculations performed by Ms. Allen and Miller Canfield, which were not produced during discovery on account of being subject to the attorney-client privilege. The Stanbery Parties argue that the calculations were "lost" due to the Bank's delay in asserting its rights under the Assignments, resulting in material prejudice. In light of the Court's findings on the first two elements of laches, it need not and does not address this theory of prejudice.

## IV. CONCLUSION

For the reasons set forth above, the Bank is entitled to judgment on Counts I, II, and III of the Counterclaim and Third-Party Complaint. This Court now enters **JUDGMENT** for the Bank and **AWARDS** it **$5,919,761** in accordance with the following:

1. Damages for breach of the Union Hill Assignments in the amount of:

    a. **$1,135,089** from Jonathan P. Meyer;

    b. **$1,330,473** from Mark Pottschmidt; and

    c. **$759,827** from Ray Brunt.

2. Damages for breach of the Harrisburg Assignments in the amount of:

    a. **$224,683** from Jonathan P. Meyer;

    b. **$495,454** from Mark Pottschmidt; and

    c. **$252,528** from Ray Brunt.

3. Damages for breach of the English Village Assignments in the amount of:

    a. **$409,345** from Jonathan P. Meyer;

    b. **$841,528** from Mark Pottschmidt; and

    c. **$470,834** from Ray Brunt.

Because all four Properties have experienced a Qualifying Sale, the damages awarded hereunder need not be deposited into escrow, but shall be paid directly to the Bank.

As to the existing Escrow Funds, which are currently held in deposit with the Court, such funds are **ORDERED** to be immediately released to Assignors. All remaining prayers for declaratory relief in Assignors' Complaint are **DENIED**.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**